

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-78,989-01

### EX PARTE STEVEN MARK WEINSTEIN, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 1167730-A IN THE 339ᵀᴴ DISTRICT COURT
### OF HARRIS COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, HERVEY and ALCALA, JJ., joined. KELLER, P.J. filed a concurring opinion in which PRICE, J., joined. KEASLER, J., concurred.

## O P I N I O N

Applicant was convicted of murdering Jerry Glaspie. He filed a post-conviction application for a writ of habeas corpus, alleging that he was denied due process because (1) the State failed to disclose that its key witness, Nathan Adams, had hallucinations and delusions, and (2) the State presented false testimony when Mr. Adams lied about not having hallucinations and delusions. The habeas judge initially filed findings of fact and conclusions of law recommending that we deny relief, but we remanded the case and asked

her to determine (1) whether Nathan Adam's testimony was false, and, if so, (2) whether applicant had shown a reasonable likelihood that the false testimony affected the judgment of the jury.[1] In revised findings, the judge found that the State unknowingly presented false testimony when Nathan Adams testified that he did not suffer from auditory or visual hallucinations. The judge also found that Mr. Adams was a key witness in establishing applicant's intent to murder. She concluded that there was a reasonable likelihood that the outcome of the trial would have been different had Mr. Adams admitted to having hallucinations.

We adopt the habeas judge's factual findings that Adams's testimony about his lack of delusions was false, but we conclude that applicant has failed to prove that Adams's false testimony was "material," *i.e.*, reasonably likely to have affected the jury's verdict.

## I.

The evidence at trial showed that, in mid-2006, applicant and Jerry Glaspie drove from Houston to Dallas planning to use applicant's $14,000 to buy methamphetamine. The drug deal did not go as planned. Although Jerry instructed applicant to bring cash, applicant tried to buy the meth with a $14,000 cashier's check. "[T]he banks were closed because it was the weekend and so there was no place to cash the check." Unwilling to wait for the banks to open, applicant left Jerry in Dallas with his check, expecting him to return to

---

[1] Applicant also claimed that he was denied effective assistance of counsel, but the habeas judge's initial factual findings and conclusions of law determined that applicant had not proven that claim. We adopt those findings and summarily deny relief on that claim.

Houston with either meth or money.

Jerry remained in Dallas, so applicant called him "four or five times a day," but Jerry "stopped answering the phone." Then applicant started calling Jerry's friends in Houston. Around November, applicant contacted Jerry's friends on Manhunt,[2] explaining how Jerry ripped him off and looking for ways to find him. Applicant "was very upset and angry." He tried to get a mutual friend to call Jerry and tell him that someone in Houston wanted to make a major methamphetamine buy. Applicant planned to "surprise" Jerry when he appeared and demand his money back. When asked what he would do if Jerry didn't have his money, applicant said, "Oh, well, we'll just scare him."

Applicant's plans grew more violent. At one point, he suggested driving to Dallas and "tak[ing] him for a ride somewhere." If Jerry didn't have his money, applicant said that "maybe we can hurt him. We can do something, just do stuff just to scare him, just to get him to, you know, cough up the money." In another plot, applicant asked his interior decorator to help bring Jerry back "with or without [his] consent" by "giving him some drug or maybe using a taser gun." Applicant also talked about using restraints: "[H]e was [going] to have to tie him up . . . and then put him in the car and bring him to Houston."

Jerry eventually returned to Houston without the drugs or applicant's $14,000. Although he was warned to stay away from applicant, Jerry told his friends that he had

---

[2] Manhunt is a "dating website . . . mainly used for hooking up for sexual encounters . . . a lot of people that seemed to get on there were also recreational drug users."

"made arrangements to pay him off in installments," so "[d]on't worry about it."

On the morning of January 29, 2007, Jerry borrowed his roommate's 4-Runner to visit some people, including applicant. Jerry never returned. Worried about Jerry's disappearance, his roommate filed a missing persons report. A few weeks later, police found the 4-Runner in a church parking lot. Although Jerry's friends feared that he was at applicant's house, no one called the police because they didn't want cops "poking around" in their drug business.

Near the end of February, residents in applicant's townhouse complex noticed an odor coming from applicant's garage. It was so strong that the mailman refused to deliver the mail. When his neighbors repeatedly asked about the smell, applicant said that his ex-roommate had hidden food all over the house, but he was trying to clean up all the rotting food.

On March 8th, HPD Officer Ladewig was dispatched to applicant's house to check out the foul odor coming from the garage. She noticed "this awful, horrible smell" and "a big swarm of flies" coming in and out of applicant's garage. Although she recognized the smell of a dead body, she was not "100 percent sure" that it was anything more than a dead animal, so she did not try to contact applicant. Two days later, she was again dispatched to applicant's home. Convinced that she was smelling a dead body, she asked her supervisor to join her, and together they knocked on applicant's door and used their loudspeaker, but applicant did not respond. Although they wanted to make a forced entry, the D.A.'s Office

told them that they could not enter without a search warrant.

At 5:00 a.m. on March 22nd, Officer Ladewig was on patrol near applicant's house. Still convinced that the odor coming from applicant's garage was from a dead body, she drove her partner to the house to get his opinion. When they arrived, applicant was standing in his front yard. He told the officers that his ex-roommate "had left rotting meat and trash all over" the house and garage. While telling his story, applicant "was stuttering" and "appeared very upset," and "nervous." When Officer Ladewig asked to see inside the garage, applicant refused because "he was too tired."

The next afternoon, a different officer was called to follow up on another odor complaint at applicant's house. He "immediately identified that smell as that of a dead body." He also smelled "the strong odor of a cleaning agent, like bleach," indicating that somebody "was trying to clean up after what they did." That officer opened applicant's garbage can and saw several empty bottles of bleach and other cleaning fluids. He couldn't contact applicant, but finally officers called for a cadaver dog who "alert[ed]" at applicant's garage, indicating that there were human remains in the garage. After obtaining a search warrant, the officers cut through applicant's gate and entered his unlocked house.

They discovered applicant lying on a bed upstairs. He "appeared to be shaking, like he was having a seizure." A police scanner was on the bed next to him. He was taken away while officers entered the garage and found applicant's car. As an officer went to the trunk of the car, he saw a bent coat hanger securing the trunk lid shut. He opened the trunk and

found a naked, "badly decomposed," body.  An engine hoist was nearby.  When they searched the rest of the house, the officers found an empty oil drum in the kitchen; two semiautomatic guns near the headboard of applicant's bed; a respirator on the bedroom floor; and baking soda, cleaning supplies, bug killers, and deodorizers near the entrance to the garage.

Dental and fingerprint evidence confirmed that the body was that of Jerry Glaspie. Jerry had no clothes on.  His wrists and legs were bound together with metal shackles, rope, chains, and wire.  There were "loops of duct tape" around his lower neck that had "probably slipped off from his lower face."  The Medical Examiner (M.E.) determined that Jerry's death was a homicide, although he could not say with 100% certainty that Jerry did not die of natural causes.  The bones in Jerry's neck had begun to disarticulate,[3] but the M.E. could not determine if this was caused by strangulation or natural decomposition.  While the exact cause of death could not be determined, the M.E. said that Jerry's death could have been caused either by strangulation or by asphyxiation from the duct tape.

Nathan Adams testified that he met applicant in a tank for jail detainees with a medical illness.  Applicant began talking about his case and that jogged Adams's memory about a television  story he had seen reporting that a dead body had been found in a car trunk after the neighbors had complained about the smell.  Adams testified that he did not read any

---

[3] "Disarticulation" describes the "separation of two bones at a joint. This may be the result of an injury or it may be done by the surgeon at operation in the course of amputation; for example of a limb, finger, or toe." OXFORD CONCISE MEDICAL DICTIONARY 214 (8th Ed. 2012).

additional news coverage, nor had he obtained any information about the crime from another source. Adams testified that applicant told him that Jerry stole $14,000 from him when he went to Dallas to buy a "car."[4] Applicant told Adams conflicting stories about how Jerry died,[5] but his second story was "that he had strangled the gentleman and had placed him in the trunk." Adams testified that applicant demonstrated "on [him] . . . the way he did it:"

> [H]e wrapped a towel a certain way and he asked me to stand up, which I did, and he came behind me and put the towel in a certain way around my neck and immediately when he pulled it, it was extremely painful. And I knew that if that was applied to anybody that they would be in serious trouble immediately.

Adams explained that applicant was a massage therapist and claimed to have "specialized knowledge of pressure points, pressure points in the body whether it was . . . to help somebody or to hurt somebody." Applicant told Adams that he put Jerry's body in the trunk of his car but the smell became horrible, so he bought dry ice and sprayed insecticides to keep the smell down. He was scared because the smell was so bad that he "stayed in his house and never left his house again until the police came."

Adams testified that applicant explained why he didn't move the body. "He had a problem because he couldn't get the trunk open . . . I guess the body had swelled so much

---

[4] Another witness testified that "automobile" was a code word for crystal meth.

[5] In his first story, applicant told Adams:
[H]e was asleep and heard a noise downstairs. He went downstairs to find this other gentleman who owed him the money in handcuffs with another man holding a pistol against him and then that gentleman gave that guy a shot and he fell asleep. And then that gentleman gave [applicant] a shot and he fell asleep. . . . And then within 24 hours he started smelling a smell.

that he could no longer open the trunk. . . . [S]o he went to a . . . store, to buy an engine hoist to try and pry it open." Applicant went into detail about the engine hoist, explaining how he had to go to the store multiple times because it was missing instructions and necessary parts.

On cross-examination, the defense extensively impeached Adams's credibility. He had been in-and-out of jail since the mid 1990s.[6] In addition, Adams admitted that he was testifying in exchange for a reduced charge from assault on peace officer, a third-degree felony, to simple assault with credit for time served. In fact, it was Adams who initially contacted the District Attorney, writing several letters offering to testify against applicant in exchange for a deal. He also admitted to having seen the indictment–one that charged applicant with "suffocating" Jerry Glaspie–while in jail. Adams admitted that he was again in custody because he failed to appear to testify and was brought to the courtroom in handcuffs.

Furthermore, Adams admitted that he suffered from bipolar disorder, for which he takes Depakote and Seroquel. But when he was asked whether his mental illness "has ever caused you to have any type of audi[tory] or visual hallucinations," Adams responded: "Not at all. No, sir, not at all." And when asked if he ever experiences false memories, Mr. Adams responded in the negative. Finally, when asked if his bipolar disorder only affected his mood, Mr. Adams responded: "Yes, sir, it's just – it's just mood swings is what it is."

---

[6] The defense impeached Adams with his prior arrests and convictions, including convictions for burglary, evading arrest, several thefts, unauthorized use of a motor vehicle, and possession of crack cocaine.

In closing arguments, the defense argued that applicant did not intend to kill Jerry. Counsel claimed that the State failed to prove what happened on the day Jerry died because the Medical Examiner could not completely rule out a natural cause of death. Thus, it was possible that applicant put Jerry in the trunk just to scare him, without any intent to kill him.[7] The defense also attacked Adams's testimony, arguing that Adams was the only witness supporting the indictment's theory that Jerry was strangled, but that Adams was not a credible witness because he had an extensive criminal record and had every reason to lie.

The State's closing focused on applicant's motive for killing Jerry and the comments he made to his friends while Jerry was still in Dallas. The prosecutor tallied up the evidence showing that Jerry was tied up, alive and struggling. And, the prosecutor argued, it did not matter exactly how Jerry died: "Was he standing? Was he sitting? I don't know and I don't have to prove that to you. Because the bottom line is the evidence is consistent with everything Nathan Adams told you." The prosecutor then turned to Adams's testimony, admitting that Adams was not "altruistic" and that he had "an agenda" in testifying. But "he knew things that there's only one way he could know about." The prosecutor pointed out that

> [t]here wasn't anything in the news about 14 grand and a death. It was a body found in the trunk. You didn't hear any testimony that there was ever anything released about how the body was killed. There was nothing. But here comes

---

[7] The defense claimed that applicant lacked the requisite intent, arguing:
[H]e put Jerry in the trunk to scare him, that he took off his clothes to humiliate him. That's what he told them he wanted to do. He wanted to scare him. He wanted to humiliate him. . . . Did he intend to kill him? No. Is it possible that he runs out of oxygen in the trunk? Yes. . . . If he wanted to kill him, he just would have shot him.

Mr. Adams and suddenly he knows things that there's no way else he could know unless he got it from the horse's mouth.

He pointed to additional information that Adams could have known only from applicant: He knew about the use of dry ice and insecticide to cover the smell of the body and he knew about the engine hoist in applicant's garage. The prosecutor argued that Adams demonstrated his credibility: "He told you everything [applicant] had told him. He didn't embellish. He didn't say this was over drugs. . . . If he was making up his testimony, don't you think he would have fitted it a little bit better?"

The jury convicted applicant of murder and sentenced him to thirty years' imprisonment and a $10,000 fine. Applicant challenged the sufficiency of the evidence on appeal, but the Fourteenth Court of Appeals affirmed his conviction.[8]

After we remanded applicant's habeas application to the convicting court, the habeas judge[9] made "revised" findings of fact and conclusions of law. She found that Adams testified falsely in "denying that he had any audi[tory] or visual hallucinations and did not remember things that didn't really happen." She listed numerous reports that said Adams suffered from delusions and hallucinations.[10] Although the judge found that neither the State nor the defense were aware that Adams's testimony was false, she found that "[t]he State

---

[8] *Weinstein v. State*, No. 14-08-01149-CR, 2010 WL 2967675 (Tex. App.—Houston [14th Dist.] July 29, 2010, pet. ref'd) (not designated for publication).

[9] The habeas judge was not the same judge who presided over the trial.

[10] For example, Mr. Adams made multiple reports to the Harris County Jail, TDCJ, MHMRA, and the Harris County Sheriff's Office that he was hearing voices in his head.

created the false impression that Adams was bipolar but never had any type of hallucinations."

On the question of materiality, the trial judge concluded that "Adams was the key prosecution witness, as he was the only person who testified that applicant admitted causing Glaspie's death. The State used Adams's testimony to establish that applicant intentionally killed Glaspie."[11] While noting that defense counsel "elicited on cross-examination that Adams received psychiatric care and medication in jail," the judge concluded that "[t]he impeachment information contained in Adams's medical records was more important than other 'impeachment' evidence presented at trial." She recommended granting relief because "[t]here is a reasonable probability that the outcome of the trial would have been different had applicant impeached Adams's false testimony that he did not have hallucinations."

## II.

### A.    Standard of Review

"On post-conviction review of habeas corpus applications, the convicting court is the 'original factfinder,' and this Court is the ultimate factfinder."[12] Thus we generally defer to

---

[11] The habeas judge also found: "When Newman told Judge Caprice Cosper during the trial that Adams has disappeared, Judge Cosper said, in essence, that if Newman did not find Adams, the State 'didn't have a case[,]'" and "Newman wrote a blog on the internet on the day that the trial ended in which he referred to Adams as a 'crack addict who just happened to be my star witness.'"

[12] *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012) (quoting *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008)).

the convicting court's findings of fact that are supported by the record.[13] We also afford that same level of deference to a habeas judge's ruling on mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.[14] However, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions."[15]   And we review *de novo* "mixed questions of law and fact" that do not depend upon credibility and demeanor.[16]

We review factual findings concerning whether a witness's testimony is perjurious or false under a deferential standard, but we review the ultimate legal conclusion of whether such testimony was "material" *de novo*.[17]

---

[13] *Id.*

[14] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[15] *Reed*, 271 S.W.3d at 727 ("[W]e will afford no deference to findings and conclusions that are not supported by the record and will ordinarily defer to those that are").

[16] *Guzman*, 955 S.W.2d at 89.

[17] *See, e.g.*, *Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009) (in addressing habeas claims involving *Brady* or false testimony, materiality of evidence is reviewed *de novo* as a question of law); *United States v. Severns,* 559 F.3d 274, 278 (5th Cir. 2009) (applying *de novo* review of the denial of a motion for a new trial based on alleged *Brady* violation, but "proceed[ing] with deference to the factual findings underlying the district court's decision"); *United States v. Joseph,* 996 F.2d 36, 39 (3rd Cir. 1993) ("[W]hen a *Brady* violation is alleged issues of law and fact usually are presented. In that circumstance, we review the district court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard."); *Moon v. Head*, 285 F.3d 1301, 1310-11 (11th Cir. 2002) (reviewing habeas determination of *Brady* materiality issue *de novo*); *see also Parker v. State*, 89 So.3d 844, 865 (Fla. 2011) (in addressing false-testimony claims, appellate court defers to trial court's factual findings, but "reviews de novo the application of the law to the facts" in determining materiality).

**B.**     **Habeas review: The issue in false-testimony claims is "materiality" not "harm."**

Generally, our review of a habeas corpus claim involves a two-pronged inquiry. First, we decide if the applicant has established a cognizable constitutional violation.[18]    Second, if a constitutional violation is shown, we determine whether the applicant was harmed by the error.[19]    An applicant demonstrates such harm with proof "by a preponderance of the evidence that the error contributed to his conviction or punishment."[20]

However, habeas claims challenging the use of false testimony are reviewed under a slightly different analysis.    The State's use of *material* false testimony violates a defendant's due-process rights under the Fifth and Fourteenth Amendments to the United States Constitution.[21]    Therefore, in any habeas claim alleging the use of material false

---

[18] *Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012) ("Habeas corpus is available only for jurisdictional defects and violations of constitutional or fundamental rights"); *Ex parte McCain*, 67 S.W.3d 204, 207 (Tex. Crim. App. 2002).

[19] *Ex parte Fierro*, 934 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

[20] *Id.*; *see Ex parte Parrott*, 396 S.W.3d 531, 534 (Tex. Crim. App. 2013) ("The general rule is . . . that an applicant must show harm to obtain habeas relief: '[A] post-conviction habeas corpus application must allege facts which show both a cognizable irregularity and harm.'  An applicant demonstrates harm with proof 'by a preponderance of the evidence that the error contributed to his conviction or punishment.'"). This standard differs from the federal habeas harmless-error standard, which asks whether the constitutional error "had substantial and injurious effect or influence in determining jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The *Brecht* or *Kotteakos* standard is the same one as the Texas standard for non-constitutional error on direct appeal. *See* TEX. R APP. P. 44.2(b);  *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos* and stating that the Rule 44.2(b) harm standard is whether the error in admitting the evidence "had a substantial and injurious effect or influence in determining the jury's verdict.").

[21] *Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex. Crim. App. 1996);  *Ex parte Chabot*, 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009); *see also Giglio v. United States,* 405 U.S. 150,

testimony, this Court must determine (1) whether the testimony was, in fact, false, and, if so, (2) whether the testimony was material.[22]

The second prong in a false-testimony claim is materiality, not harm. Only the use of *material* false testimony amounts to a due-process violation. And false testimony is *material* only if there is a "reasonable likelihood" that it affected the judgment of the jury.[23] Thus, an applicant who proves, by a preponderance of the evidence, a due-process violation stemming from a use of *material* false testimony necessarily proves harm because a false statement is material only if there is a reasonable likelihood that the false testimony affected the judgment of the jury.[24] The applicant must still prove his habeas-corpus claim by a preponderance of the evidence, but in doing so, he must prove that the false testimony was material and thus it was reasonably likely to influence the judgment of the jury.

## C.    Is the testimony false?

Determining whether testimony is false is distinct from the materiality inquiry.[25] This

---

153-54 (1972).

[22] *See Ex parte Chavez*, 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012).

[23] *Chavez*, 371 S.W.3d at 206-07 ("The present standard for materiality of false testimony is whether there is a 'reasonable likelihood that the false testimony affected the applicant's' conviction or sentence.").

[24] In *Chavez*, we held that, because the use of false testimony was not material, no harm analysis was necessary. 371 S.W.3d at 210. Although we suggested that "materiality" and "harm" might be separate inquiries, it is difficult to hypothesize how an applicant could prove one without proving the other.

[25] *See Giglio*, 405 U.S. at 154 (explaining that not every finding of the use of false evidence is incompatible with due process; courts must also determine whether that evidence

Court has consistently held that testimony "need not be perjured to constitute a due process violation; rather, 'it is sufficient that the testimony was 'false.'"[26] This due-process claim is "not aimed at preventing the crime of perjury–which is punishable in its own right–but [is] designed to ensure that the defendant is convicted and sentenced on truthful testimony."[27] Neither a witness's nor the State's good or bad faith is relevant to a "false-testimony due-process error analysis."[28] The proper question in a false-testimony claim is whether the particular testimony, taken as a whole, "gives the jury a false impression."[29]

**III.**

**A.    Were Adams's statements denying any auditory or visual hallucinations false?**

The habeas judge's finding that one portion of Adams's testimony was false is supported by the record.[30] At trial, the State asked Adams if his mental illness "has ever

---

was "material" such that "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury'").

[26] *Ex parte Chavez*, 371 S.W.3d at 208 (quoting *Ex parte Robbins,* 360 S.W.3d 446, 459 (Tex. Crim. App. 2011)); *Ex parte Napper*, 322 S.W.3d 202, 244 (Tex. Crim. App. 2010) (nothing in the record suggested that the witness intentionally provided false testimony or thought that his testimony was inaccurate).

[27] *Ex parte Chavez*, 371 S.W.3d at 211 (Womack, J., concurring) (internal quotation marks omitted).

[28] *Ex parte Chavez*, 371 S.W.3d at 208.

[29] *Id*. (citing *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)).

[30] "The medical records demonstrate that Adams testified falsely in denying that he had any audial or visual hallucinations and [that he] did not remember things that didn't really happen."

caused [him] to have any type of audial [sic] or visual hallucinations." Adams responded: "Not at all. No, sir, not at all."[31] This testimony was flatly incorrect.[32] Evidence that Adam's suffered from auditory hallucinations includes:

- On July 28, 2004, Adams reported to MHMRA that "voices . . . tell him to hurt himself" and that he could not sleep because "the voices keep him awake."

- While at TDCJ, Adams reported "voices telling me to hurt other people and thinking people were out to kill me."

- "While confined at HCJ on October 16, 2007, Adams reported that he 'was trying to kill himself and having auditory hallucinations.'"

- In 2007, Adams reported to MHMRA that he was "hearing his father's voice."

- In 2008, just three months before sending his first letter offering to testify against applicant, Adams again reported hearing "voices inside [his] head."

- On December 14, 2008, just two days after testifying that he did not suffer from auditory or visual hallucinations, Adams told a mental-health clinic nurse that "he had a history of auditory hallucinations and bipolar disorder with psychotic features."

It is clear that this portion of Adams's testimony was false; not only did he suffer from auditory hallucinations, but he suffered from these hallucinations at a critical moment– while sharing a cell with applicant.

---

[31] *Id.*

[32] One might argue that, because those with a bipolar mental illness do not normally have hallucinations, Adams might have suffered from another different mental illness, such as schizophrenia, and it was *that* mental illness, not the bipolar mental illness, that caused his hallucinations. This is, however, a very fine point, and the trial judge found, as a factual matter, that Adams lied. We must defer to that finding because it is supported by the record.

**B**.      **Was Adams's false testimony denying auditory hallucinations material?**

Although one portion of Adams's testimony was clearly false, the record does not support the legal conclusion that this false denial of hallucinations was material to the jury's verdict. While Adams's false denial prevented the defense from impeaching his ability to accurately perceive and relate events because of hallucinations, we do not agree with the habeas judge that this potential impeachment evidence "was more important than other 'impeachment' evidence presented at trial." The defense had already developed a plethora of impeachment evidence, including,

• Adams was on medication for a bipolar disorder.

• Adams had been arrested and convicted for multiple crimes, including burglary, evading arrest, theft of a firearm, possession of crack cocaine, and forgery. He was a professional crook.

• Adams had a strong motive to testify against applicant: his third-degree felony charge was reduced to a misdemeanor, and he was released for time served.

• Adams read the indictment against applicant and knew that the indictment alleged "suffocating" the complainant, as one cause of death.

• Adams sent multiple letters to the district attorney, asking to testify against applicant in exchange for a deal.

• Adams failed to appear to testify against applicant. He was taken into custody and brought into the courtroom handcuffed.

In sum, the defense had ample ammunition at trial to argue that Adams was a thoroughly discredited and dishonest witness who should not be believed on any topic. That is precisely what the defense did argue.

Further, the State corroborated many of the facts to which Adams testified, severely limiting any impeachment value the hallucination evidence could have had. Adams testified that applicant had purchased an engine hoist and attempted to use pesticides to cover the smell. The State introduced evidence showing the existence of the engine hoist, pesticides, and deodorizers. Adams also knew that applicant's victim had stolen exactly $14,000 while purchasing a "car" in Dallas. The State presented multiple witnesses who testified that Jerry had stolen that exact amount of money from applicant and that purchasing a car is slang for buying meth. It is unlikely that any jury would believe that Adams received this accurate and corroborated information from some auditory hallucination.

And Adams's long history of auditory hallucinations were "persecution" hallucinations. All of them revolved around voices telling him to hurt himself or other people. They were not "descriptive" hallucinations in which voices relayed specific information to him. Here, Adams never testified that applicant was trying to hurt him or that he was trying to hurt applicant. Indeed, Adams's testimony was of the Sgt. Friday "Just the facts, ma'am" variety, and he never expressed any negative emotions or feelings toward applicant. As the prosecutor noted in his closing argument, Adams "didn't embellish. He didn't say this was over drugs. . . . If he was making up his testimony don't you think he would have fitted it a little bit better?"

Finally, applicant's conviction was supported by an abundance of evidence unrelated to Adams's testimony. That evidence included,

- Testimony by several of applicant's friends that Jerry stole $14,000 from applicant;

- Testimony that applicant was incredibly angry at Jerry and reached out to mutual friends to locate him;

- Testimony that applicant formulated several schemes to "scare" Jerry, including a scheme to drug him, tie him up, and forcibly bring him to Houston;

- Testimony that Jerry was going to see applicant on the day he disappeared;

- The fact that Jerry's body was discovered in applicant's car, which was parked in applicant's garage;

- The fact that Jerry's arms and legs were bound, that his wrists were bound with metal shackles, rope, chains, and wire, and that duct tape circled his neck;

- The evidence that applicant attempted to cover the smell from Jerry's decomposing body;

- Testimony that applicant was found next to a police scanner, tuned to the police's radio frequency;

- Applicant's repeated lies to his neighbors and the police, claiming that the smell from his garage was caused by rotting meat hidden by his roommate;

- The Medical Examiner's testimony that Jerry's death was a homicide; and

- The Medical Examiner's testimony that disarticulating bones in Jerry's neck could have been caused by strangulation.

We do not agree that Adams's testimony was necessary to prove intentional murder.

A jury may rely on circumstantial evidence to prove a defendant's guilt.[33]  Applicant had a

strong motive to murder Jerry, and "[m]otive is a significant circumstance indicating guilt."[34]

---

[33] *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2005).

[34] *Id.* at 50 (citing *Harris v. State*, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987)).

Applicant's intent to commit murder may also be inferred from circumstantial evidence, including his acts and words,[35] such as his attempts to persuade others to help him kidnap Jerry to make him pay back the stolen money, the four different types of bindings on Jerry's wrists, and the use of duct tape over Jerry's mouth that could have caused his asphyxiation. In addition, "[a]ttempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."[36] Applicant's attempts to conceal Jerry's body and his implausible explanations to police are strong evidence of applicant's consciousness of guilt. Jerry was found in the trunk of applicant's car, which was parked in applicant's garage. Jerry had been concealed in this trunk for many weeks. Applicant's garage contained deodorizers, pesticides, and baking soda, demonstrating that he was attempting to conceal the odor. The evidence showed that applicant stayed in the townhouse the entire time Jerry's body was in his trunk. When asked about the smell, applicant either did not respond or made up stories about his roommate leaving rotting meat in the house. This body of evidence, especially when coupled with applicant's motive to kill Jerry, is sufficient to prove that applicant

---

[35] *Id.* (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)).

[36] *Id.*; *See also People v. Graham*, 191 Cal. App. 2d 521, 539 (Cal. Ct. App. 1961) ("Where a homicide has been committed and the body concealed, it is a legitimate inference that the person who concealed the body is connected with the crime, either as its direct perpetrator or as a participant"); *State v. Austin*, 368 N.E.2d 59, 69 (Ohio Ct. App. 1976) ("the concealment or destruction of a body is a circumstance permitting not only an inference of guilt as to homicide, but may also be considered in finding premeditation."); *Edmonds v. Commonwealth*, 329 S.E.2d 807, 812 (Va. 1985) (circumstantial evidence including the defendant's efforts to conceal the victim's body was sufficient to prove murder was willful, deliberate, and premeditated).

intentionally murdered Jerry.

Given all of the circumstantial evidence, it is very unlikely that Adams's testimony was the tipping point.  Therefore we conclude that applicant has not proven his habeas-corpus claim by a preponderance of the evidence.  He has failed to show that Adams's false testimony about his auditory hallucinations was "material" such that there is "a reasonable likelihood" that this false testimony affected the jury's judgment.[37]  We therefore deny relief.

Delivered: January 29, 2014
Publish

---

[37] *Ex parte Chavez*, 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012).