

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-81,532-01

### EX PARTE BERNHARDT TIEDE II, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 1997-C-103-A IN THE 123ᴿᴰ DISTRICT COURT
### FROM PANOLA COUNTY

ALCALA, J., filed a concurring opinion in which PRICE, JOHNSON, and COCHRAN, JJ., joined.

### CONCURRING OPINION

I concur in the Court's judgment granting habeas corpus relief to Bernhardt Tiede, applicant, by ordering that he receive a new hearing on punishment. Applicant was sentenced to life imprisonment for first-degree murder after the jury rejected his claim of sudden passion arising from an adequate cause, which, had it been accepted by the jury, would have reduced the offense level to a second-degree felony.[1] At trial, the State disputed

---

[1] The Texas Penal Code provides that murder is a first-degree felony but becomes a second-degree felony if, "[a]t the punishment phase of a trial, the defendant [ ] raise[s] the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause" and proves the issue in the affirmative by a preponderance of the evidence. TEX. PENAL CODE §19.02(d).

applicant's claim of sudden passion by presenting testimony from its expert, psychiatrist Dr. Gripon, who described applicant as having an unremarkable mental-health history. Now, in light of the habeas record that shows that Gripon's testimony was false, the State agrees that applicant caused the decedent's death out of sudden passion arising from an adequate cause. The State currently makes a factual representation that, had it known then what it knows now, it would have sought to punish applicant under a second-degree punishment range, and the habeas court has determined that representation to be credible. Furthermore, regardless of the merits of applicant's claim of sudden passion, the habeas evidence supports the conclusion that the jury likely would have sentenced applicant to a period of confinement for less than life in prison in light of the conclusive evidence that now explains his state of mind as experiencing dissociation when he killed the decedent and left her body in a refrigerator for an extended period of time. Having reviewed the pertinent portions of the trial record and the entire habeas record, I conclude that applicant has proven by a preponderance of the evidence both requirements for establishing his false-evidence claim, namely, that the habeas record shows that evidence used in the punishment phase of his trial was both false and material. *See Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). I, therefore, would grant relief on that basis.[2]

## I. Factual Background

---

[2]     This ground urges the Court to grant relief on the basis that "there was false evidence presented at trial which was such that, once known to be false, confidence in the punishment verdict is undermined."

In the guilt stage of applicant's trial, the jury heard applicant's version of the events, which he gave in his written statement to police officers after the decedent's body was discovered. In that written one-page statement that contains few details, applicant stated,

> [The decedent] had become very possessive over my life. She was now evil and wicked. But I still cared for her. I went to her house on Nov. 19, 1996, and made coffee at [approximately] 7:00 a.m. I then went home to take a shower. I returned at [approximately] 10:00 a.m. I was there alone with her. [The decedent] had a rifle in the freezer closet. She kept it there to shoot crows and blackbirds in the yard. She was heading out of the house from the hallway to the garage. I had moved the rifle into the bathroom near the garage. She walked out into the garage towards my car. I took the rifle and shot [the decedent] in the back.

Applicant briefly described how he then shot the decedent multiple times, placed her body into a freezer, covered her body with food, and cleaned up the garage.

The trial record before us also includes the supplemental report of Captain David E. Jeter, which revealed that applicant made statements to the investigative officers beyond the few details that were included in his written statement. The report states,

> Tiede states that [the decedent], over the last couple of years, had become very mean. Tiede stated that she was very jealous of his friends and attempted to destroy any friendship he had with anyone else.

The report also indicates that Tiede "stated that he had no life of his own."

Applicant's punishment-phase testimony further explained the events beyond what was contained in his written statement. He described his relationship with the decedent as "being in prison to some degree." He expressed that feeling as "being choked, not being able to get a breath, being able to just—just being smothered." Applicant discussed an incident

when applicant told the decedent that he could no longer be friends with her because of her possessiveness, and the decedent locked the gate to her house with a remote control so that he could not leave as he attempted to get away from her. The trial record shows that applicant generally described how he shot the decedent in her back as she was bent over but, because the State's attorney used physical gestures that were not described in the trial record, it is unclear precisely where appellant and the decedent were located relative to each other at the time of the shooting.

In addition to applicant's punishment-phase testimony, applicant presented testimony from his own expert, Dr. Mears, whom the judge did not permit to give testimony specific to applicant himself. During the voir dire portion of his testimony outside the presence of the jury, however, Dr. Mears relayed applicant's explanation for killing the decedent, stating, "[H]e said when he shot her that he felt out of his body." Dr. Mears determined that that description was "a pretty classic kind of dissociative feature," and he noted that applicant had some dissociative features. During his testimony generally describing the causes of dissociation, Dr. Mears included "a child history of trauma" and occupations dealing with highly stressful situations, such as funeral directors. Dr. Mears's testimony suggesting that applicant had experienced dissociation, however, was heavily undermined by the State's expert, Dr. Gripon, who indicated that applicant had an unremarkable mental-health history that would not support that determination.

It is evident that the trial court believed that applicant's punishment-phase testimony

constituted some evidence that he killed the decedent under the immediate influence of sudden passion arising from an adequate cause because the jury instructions permitted the jury to make an affirmative finding on that matter. *See* TEX. PENAL CODE §19.02(d). Had there been no evidence of sudden passion, the trial court would have erred by including an instruction asking the jury to determine if applicant killed the decedent out of sudden passion. The matter of sudden passion, therefore, was a factual matter to be resolved by the jury at applicant's trial.

In his closing argument to the jury in the punishment phase of applicant's trial, the State's attorney said,

> Let's talk about our experts. Mine—my witness said their witness didn't know what he was talking about. My expert, the psychiatrist Dr. Gripon, an M.D., was much better than Dr. Mears, Ph.D[,] for many reasons, one of which [is that] my guy cost[s] more. And even the first-class, high-flying defendant knows you get more for your money. And I did.

Although the jury rejected applicant's evidence of sudden passion at the time of his trial, that is one of the questions before this Court in this application for a writ of habeas corpus, along with the matter of whether the false evidence would have otherwise affected the punishment that was actually assessed by the jury. The question is whether applicant was harmed by false evidence introduced in the punishment phase of his trial that materially colored the jury's consideration of his sudden-passion evidence and influenced its overall determination to assess a life sentence, rather than a lower one than that in light of applicant's mental-health history that has now come to light.

## II.  Analysis

Applying a standard of review that is deferential to the habeas court's findings of fact, I agree that applicant has established the first requirement by demonstrating the existence of new evidence showing that testimony at his trial was false. *See Weinstein,* 421 S.W.3d at 665.  Unaware of applicant's suppressed memories at the time of applicant's trial, Gripon testified falsely that applicant had an unremarkable mental-health history.  In his 2014 affidavit, Gripon explains,

> When asked by the State regarding the relevance of the dissociation discussion to the case at hand, I testified that 'there isn't any' because no supporting information for that condition was offered.  I testified that if a person seemed to have a clean bill of mental health, it would certainly not support the idea that they had a dissociative episode at some time several years prior.  From what I heard and knew, the defendant had an unremarkable mental health history.  I was not aware of information indicating that Mr. Tiede was a victim of childhood sexual abuse, nor of the abusive nature to which the decedent had acted toward Mr. Tiede nor his associates.  This information would have made the discussion of a dissociative episode, at the time of the incident, highly relevant.  These facts, along with the information that Mr. Tiede had extensive experience in hiding his sexual identity from the public, explains Mr. Tiede's ability to compartmentalize his behavior after the incident. . . .  The new evidence also helps to explain Mr. Tiede's ability to compartmentalize his life and thoughts, subsequent to the incident, allowing him to preserve the decedent's body and continue on with his life, as if nothing had happened.

According to the 2014 habeas affidavit by Gripon describing his recent interview of applicant, applicant explained to Gripon why he killed the decedent stating,

> He described the incident as arising out of Marge Nugent being, specifically, abusive/critical toward Chris, the young gardener with whom Bernie had been sexually involved.  And, Bernie feeling that he "could not take this any longer" and [he] grabbed the rifle and shot Marge Nugent, a number of times [in] the back.  He reports having done this without significant reflection and as an

impulsive reaction to an overwhelming emotion of being manipulated/controlled and abused. . . . At that point, he states that he absolutely had no plan as to what to do with her body nor how to respond/react. Therefore, he states that he just tried to appear as if "nothing had happened."

The new evidence to which Gripon refers as the underlying reason for changing his expert opinion is applicant's recent revelation that he was sexually abused as a child for an extended period of time. I agree that, at first blush, it seems peculiar to characterize information as newly discovered—the fact that he had been sexually abused as a child—when, at least at some subconscious level, it had to have been known by applicant himself at the time of trial. But this phenomenon was explained in the habeas record by experts who averred that applicant had been the victim of sexual abuse as a child for many years and had suppressed his actual awareness of it to the point that he was incapable of revealing the memories to anyone at his trial. According to a 2014 affidavit by Noel Bridget Busche-Armendariz,[3] when applicant was a child, he "suffered from an extensive history of childhood sexual abuse" by his uncle, who "repeatedly sexually abused him and his cousin when they were children." She observed that applicant "did not disclose this sexual history until a recent interview" with her, and that his "delayed disclosure can be explained by a number of factors found in research literature on child sexual abuse survivors."

In light of the habeas evidence presented by Gripon and the other mental-health

---

[3]      Busch-Armendariz is a licensed social worker, director of the Institute on Domestic Violence and Sexual Assault, and a Professor at the School of Social Work at the University of Texas at Austin.

experts, the habeas court's findings of fact determined that the habeas evidence was credible, stating, "[T]he Court finds that . . . Dr. Gripon stated that: 'based on reasonable psychiatric probability, a review of his history and the history of the offense, as it is described, would indicate that he suffered from a Dissociate Episode, at that time.'" As required by our precedent, I apply a deferential standard of review to the habeas court's finding on the matter of whether the evidence was false, and, determining that the habeas court's finding is supported by the habeas record, I conclude that applicant has established that the evidence was false. *See id*. at 664 (this Court conducts deferential review of habeas court's determination that evidence was false).

In contrast to the deferential review of the habeas court's fact finding that the evidence was false, this Court conducts a *de novo* review of the question whether the false evidence was material under the facts of the case. *See id*. "Only the use of material false testimony amounts to a due-process violation. And false testimony is material only if there is a 'reasonable likelihood' that it affected the judgment of the jury." *Id*. at 665.

Applying this *de novo* standard of review, I determine that applicant has established that the false evidence was material to the punishment that was assessed by the jury. The State's attorney provided an affidavit averring that, had he been aware at the time of trial of the evidence now included in this habeas application, he would have sought to punish applicant for second-degree murder as opposed to first-degree murder. The situation before us is unusual in that the two opposing parties to this proceeding, applicant and the State,

agree that, based on the new evidence showing that trial testimony was false in the punishment stage, applicant should have been punished under the second-degree-felony punishment range. The evidence at the habeas hearing was not contested and, despite the fact that these types of parties are normally adverse to one another, the State and applicant were in agreement in requesting that the habeas court recommend that relief be granted.

Furthermore, in light of the State's attorney's affidavit that he would have used his prosecutorial discretion to seek a lower punishment range in the interest of justice had the false evidence not been introduced at applicant's trial, there is no doubt that the false evidence negatively impacted the punishment imposed by the jury in this case. *See* TEX. CODE CRIM. PROC. art. 2.01 ("It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done."). And even if dissatisfied with the manner in which a State's attorney uses his prosecutorial discretion, a complainant or complainant's family has no authority, at least not in criminal court, to limit that discretion. Based on the State's attorney's representations that he would have used his prosecutorial discretion to seek only a second-degree-felony punishment range and the fact that the habeas record and trial court's credibility findings support that representation, I would find that applicant met his burden of proof to establish the materiality of the false evidence.[4]

---

[4] Here, the State's attorney has not merely conceded error, as a matter of law, but rather has provided facts about how he would have proceeded at the sentencing phase of applicant's trial had he been aware of the evidence now presented in this application. I agree that a party's concession

(continued...)

I note here that, although there has been much focus on whether applicant's evidence now establishes sudden passion, the pertinent inquiry is really whether he has produced a record that shows that the State's use of false evidence materially affected the punishment that was assessed in the sense that he likely would have received a lesser sentence than life in prison had the false evidence not been used. In light of the trial-record evidence by Dr. Mears that applicant experienced dissociation at the time that he killed the decedent, and in light of Dr. Gripon's newly revealed acknowledgment that his trial testimony disavowing the existence of dissociation was false, the habeas record has shown that the jury was misled into believing that applicant had an unremarkable mental-health history. Had the jury known then what this record now reveals, I believe it is highly likely that applicant would have received a sentence less than life in prison, even if the jury continued to reject applicant's claim that he killed the decedent out of sudden passion arising from an adequate cause.

Because I conclude that applicant has established both of the required elements of a false-evidence claim, I concur in this Court's judgment granting relief.[5]

---

[4](...continued)
on a matter of law that is mistaken should not necessarily affect this Court's resolution on that matter of law. Here, however, the State's attorney provides a factual statement about how he would proceed to seek to have applicant punished under the facts of the case. The habeas court found those facts to be credible. Having reviewed the pertinent portions of the trial record and the entire habeas record, there is no rational basis for determining that the State's attorney's factual representations lack veracity.

[5] Applicant's alternative ground states, "There is relevant scientific evidence that was not available to be offered at the time of the trial in the instant case, and which contradicts scientific evidence relied on by the State at trial." Because applicant's grounds are alternatives, it is

(continued...)

Filed: November 26, 2014

Publish

---

[5](...continued)
unnecessary to reach this ground.