

# In the Court of Criminal Appeals of Texas

No. WR-93,211-01

EX PARTE GARLAND "BUTCH" MARTIN,

*Applicant*

On Application for Writ of Habeas Corpus
Cause No. CR24,279-A
From the 142nd District Court
Midland County

YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.

Twenty-five years ago, in 1999, Applicant was charged with and convicted by a jury for the capital murder of his wife, Marcia Pool, his stepson, Michael, and his daughter, Kristen. They each died inside their home after it caught fire and burned on February 25, 1998. Applicant was sentenced to three life terms for these crimes.

Applicant now claims, in his initial post-conviction application for writ of habeas corpus, that he is entitled to relief from his conviction on several grounds. The Court grants relief on the basis that Applicant is actually innocent. Majority Opinion at 1. It does so in spite of the fact that the convicting court recommended denying relief on that ground. And perhaps because it grants actual innocence relief, the Court avoids discussing whether relief is appropriate for Applicant's other claims, on which the convicting court recommended granting relief, including Applicant's claims that: (1) newly discovered scientific evidence proves by a preponderance of the evidence, as required by Code of Criminal Procedure Article 11.073, that had that evidence been available at the time of his trial, he would not have been convicted, and that (2) material false evidence was used against him at his trial and there is a "reasonable likelihood" that it affected the judgment of the jury.

I dissent to the Court's decision because, according to the standard announced in *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), Applicant has not shown entitlement to actual innocence relief. I also disagree with the convicting court's conclusion that Applicant is entitled to relief on his Article 11.073 new-scientific-evidence claim and his false evidence claim, because he has not shown, even by a preponderance of the evidence, that the new scientific evidence presented in this proceeding would have caused a different result, and he has not shown a reasonable likelihood that the evidence from his trial that he claims to have been false affected the judgment of his jury. Finally, I agree with the convicting court that Applicant is not entitled to relief on any of his other claims.

## I. Background

For purposes of evaluating Applicant's claims, it will be helpful to understand the evidence presented at his trial as consisting of two distinct kinds. The first and most prominent kind was historical-fact-based testimony. This consisted of evidence showing that Applicant's family died inside their home when it burned down, that Applicant had the motive, the intent, and the opportunity to kill his wife and children by burning down their house with them in it when they died, and that Applicant's highly suspicious behavior and odor at and around the time of the fire demonstrated that he was indeed responsible for their deaths. The other kind of evidence was scientific-conclusion-based testimony. This consisted of testimony by experts which tended to demonstrate scientific bases to conclude that the fire that burned down Applicant's family's home was intentionally set and that Applicant's family was rendered unconscious inside the home by someone who did not want them to escape the fire.

### A. Evidence of the First Kind—Historical-Fact-Based

The court of appeals' opinion, from Applicant's direct appeal, summarized the evidence of the first kind as follows:

> There is evidence that Pool and Appellant had a volatile relationship. Pool's mother, Mary Stephens ("Stephens"), testified about events of a July 1997 evening where Pool and her children were dropped off at Stephens' home by Appellant, who immediately left, and Pool was beaten so badly she had to be taken to the hospital. Pool told her mother that Appellant had beaten her. Appellant later apologized to Stephens concerning the incident, and said "it never was going to happen again." On the day of the fire, Pool called her mother and asked her if she would come pick up Pool and her children so the children could take

baths and eat some lunch. Stephens arrived about 12:15 p.m. and was helping the children put their shoes on when she heard an argument between Appellant and Pool. Pool told Appellant she was planning on leaving him and intended to take the children with her. According to Stephens, Appellant replied, "If you try to leave me again, I'm going to kill you and your . . . f-----kids." Appellant, Pool, and the children spent the day at Stephens' home, and returned to their home around 4:30 p.m.

Dana Hendry testified that she visited with Appellant and Pool on February 24, 1998. Pool asked Hendry if she would take her and the children to her mother's house so she could end her relationship with Appellant. Appellant responded to this by stating that he would not allow Pool to leave him again, and if she tried, he would kill her. Sammy Carr testified that the night before the fire, he and Appellant were drinking, and traveled to a nearby store to purchase beer. While at the store, Appellant had a confrontation with his employer, Junior Boiles, which left him in a bad mood. When Sammy and Appellant returned to Appellant's house, Appellant stated he could burn up the house, and he actually tried to light the grass on fire with his cigarette lighter. After Carr told him to stop, Appellant told him he was only joking. Finally, James Wood testified that Appellant had once offered to help him burn down a trailer Wood wanted removed in an effort to collect insurance money. A few days prior to the fire, Wood had observed Appellant with a fire in his barbecue pit. Appellant, standing five or six feet away from the pit, was squirting lighter fluid into the fire.

Around 6 p.m., Robert McGuairt passed by Appellant's home, and saw Appellant walking towards his house with a container in his hand. About 6:30 p.m., Appellant's friend Stacy Carr, arrived to pick him up to do some work in preparation for building a fence on the land of Dr. William Maurer. Carr honked his horn when he arrived at Appellant's home, and as Appellant exited the house, Carr noticed something unusual. He testified, "He came out the door backwards with his back to me. He

opened the door eight, ten inches, squeezed through, and then shut the door." Appellant and Carr arrived at Dr. Maurer's around 6:45 p.m., took the measurements, and left between 6:50 p.m. and 7 p.m. As Carr was taking Appellant back to his home, a highway patrol vehicle overtook and passed them, and Appellant stated, "I hope they are not going to my house." As they came closer to the location of Appellant's house, Appellant stated that he hoped it was not his house on fire. Carr immediately noticed smoke and flames. At one point, after arriving at the house, Appellant threw a ladder through a front window of the house which accelerated the fire. While they were in front of the house, a deputy heard Appellant tell his father, "I won't be [f-----] her anymore." Appellant appeared emotionless when he said this.

On the evening of the fire, Appellant was transported to [a] psychiatric hospital in San Angelo. The ambulance attendants both remembered that Appellant had an odor about him that was not associated with the fire. One of the attendants described the odor as smelling like paint thinner or charcoal lighter fluid.

*Martin v. State*, No. 08-99-00268-CR, 2000 WL 1793190, at \*2–3 (Tex. App.—El Paso Dec. 7, 2000, pet. ref'd) (not designated for publication).

## B. Evidence of the Second Kind—Scientific-Conclusion-Based

The court of appeals then summarized the evidence of the second kind as follows:

Dale Little was the Fire Marshall for Midland County. His responsibilities include[d] fire investigation and prevention. He confirmed the fatalities in the fire. After his investigation, Little concluded that the fire started in the back part of the house, and was not caused by an electrical malfunction. He opined that an ignitable liquid had been poured by the back door, and had been ignited.

Little contacted Ron Kellough, a fire investigator in Midland for assistance. Kellough went to the scene and looked at it for about an hour. He told Little he noticed a

"pour pattern" just inside the back door of the west bedroom. He did not believe the fire could have started outside on the porch.

John Corn was a Lab Director for Armstrong Laboratories in Arlington, Texas, a company that specializes in detecting accelerants from fire debris samples. He tested debris from this fire, and detected Norpar, a substance used in lamp oils, and deparaffinated kerosene, a substance used in charcoal lighter fluid. He testified that Norpar is used in pesticides, but that he found no evidence of pesticides in the samples, and that Norpar is not used in carpet or plastics. He testified that deparaffinated kerosene is not used in carpet, plastics, or anything commonly in use in a home.

Dr. David Hoblit was the Chief Medical Examiner in Lubbock County. He performed an autopsy of Pool and her son, Michael Stephens, and concluded that both had suffered blunt force trauma to the head not associated with the injuries sustained in the fire. Both Pool and Michael Stephens ultimately died of carbon monoxide poisoning. Kristen Martin was examined by another pathologist, and the cause of her death was determined to be carbon monoxide poisoning.

Dr. Harold Gill-King was a forensic anthropologist. He examined the body of Michael Pool and determined that he had suffered a blunt-force trauma to the head not associated with the fire. He also found it curious that the child was discovered in a supine position, as most fire victims are usually prone because they are trying to escape the fire. He opined that fire victims found in a supine position have been incapacitated prior to the fire.

*Id.* at *3.

## II. THE CURRENT PROCEEDING

Applicant filed an application for a writ of habeas corpus in the convicting court in October of 2002. The writ was received by this Court for the first time, however, in October of 2021. The convicting court

found that, "[f]or unknown reasons," the district clerk did not forward the application to this Court until then.

Applicant filed an amended application in July of 2022. On remand from this Court, the convicting court made findings that former counsel for Applicant was working on "several other tracks not memorialized in the record" and that "the constant back and forth between the court, [former counsel for Applicant], and the State," alongside "active case developments," caused delays in its resolution.[1] I find no reasonable explanation for the extreme delay in prosecuting this application for habeas relief.

Nearly twenty years elapsed between the filing of the initial application in this case and its first presentation to this Court in October of 2021. There is inevitable degradation in the quality and reliability of evidence over such an extended period of time. Still, I endeavor here to explain why Applicant's claims should be denied *on their merits.*

### A. Actual Innocence

In his twelfth ground, Applicant alleges that he is actually innocent. The convicting court's findings rejected that claim. But this Court grants relief on that ground. I cannot agree with the Court's assessment. Applicant has not demonstrated an entitlement to actual innocence relief, even under the standard announced by this Court in *Elizondo.*

Even though Applicant presents evidence in this proceeding that tends to rebut the scientific-conclusion-based evidence presented in his

---

[1] Even though these might arguably *seem* like an explanation, they are so general, non-specific, and conclusive, as to amount to no explanation at all.

trial, and he presents new evidence tending to rebut the truthfulness of certain other science-based testimony presented at his trial, he presents no evidence to rebut the evidence of the first kind described above: the very compelling historical-fact-based evidence presented against him at his trial. This evidence showed that Applicant's family died inside their home when it burned down, that Applicant had the motive, the intent, and the opportunity to kill his wife and children by burning down their house with them in it when they died, and that Applicant's highly suspicious behavior and odor at and around the time of the fire demonstrated that he was indeed responsible for their deaths. Having failed on habeas to present any evidence at all rebutting historical-fact-based evidence against him, Applicant also fails to show that no rational juror would have convicted him.

### B. New Science

In his first and second grounds, Applicant relies on new science. In his first ground, he argues that new scientific arson evidence demonstrates that ignitable liquids discovered in fire debris are commonly found in everyday household products and are not indicative of arson. In his second ground, he argues that new scientific arson evidence demonstrates that the "pour pattern" evidence relied upon by the arson investigators has been entirely debunked. The convicting court recommends granting relief on these claims. I disagree with that court's assessment.

Applicant bases his claim for relief on these grounds on Article 11.073 of the Texas Code of Criminal Procedure. This Court has said that an applicant can obtain relief under Article 11.073 if he can show

by a preponderance of the evidence that he would not have been convicted had the new scientific evidence been available at the time of trial. TEX. CODE CRIM. PROC. art. 11.073(b); *Ex parte Hightower*, 622 S.W.3d 371, 372 (Tex. Crim. App. 2021).

Applicant's claim is not persuasive. Applicant's new science evidence relates only to the evidence of the second kind described above. Its only tendency is to rebut the testimony presented at trial by experts to demonstrate a scientific basis for the conclusion that the fire that burned down Applicant's family's home was intentionally set. But the defense also presented rebuttal evidence of a similar nature at the time of trial, and that did not make a difference.

Even though the new scientific evidence presented here seems somewhat more compelling than that which was presented at trial, it still is not conclusive. It would still need to be weighed by a jury. It also does not show that the fire in Applicant's house *was not* intentionally set. It only tends to rebut the *scientific* evidence presented at Applicant's trial suggesting that it was. And, even though it could have served to rebut the scientific arson evidence presented at Applicant's trial, it does not rise to the level of evidence that would have caused a different result.

Even if the new evidence were conclusive and would require a determination that the ignitable liquids discovered in the fire debris were definitively *not* accelerants, and that what fire investigator Kellough saw in the remains of the fire was *not* a "pour pattern," the most devastating and compelling evidence of Applicant's guilt presented at his trial would remain. And that evidence showed that Applicant's family died inside their home when it burned down, that Applicant had

the motive, the intent, and the opportunity to kill his wife and children by burning down their house with them in it when they died, and that Applicant's highly suspicious behavior and odor at and around the time of the fire demonstrated that he was indeed responsible for their deaths. Applicant's new scientific evidence does nothing at all to rebut that highly compelling evidence, and it is that evidence that likely persuaded the jury to find Applicant guilty in this case.

### C. False Evidence

In his third, fifth, and sixth grounds, Applicant claims that his conviction was based on false evidence. In his third ground, he argues that the evidence presented at his trial by forensic anthropologist, Dr. Gill-King, showing that his son suffered "blunt force trauma[,]" was false. In his fifth ground, he argues that former pathologist David Hoblit, who the convicting court found has since lost his license and was sentenced to prison for 18 months,[2] testified falsely about injury to Pool—Applicant's wife. And in his sixth ground, Applicant argues that Hoblit similarly testified falsely about injury to Applicant's son. The convicting court also recommends granting relief on these claims. But once again, I disagree with that court's assessment.

"Only the use of *material* false testimony amounts to a due-process violation." *Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014); *see also Ex parte Chaney*, 563 S.W.3d 239, 263–64 (Tex. Crim. App. 2018). In a habeas claim alleging the use of material false testimony, the Court must decide: "(1) whether the testimony was, in

---

[2] No evidence suggests that Hoblit's prosecution or sentence had anything to do with his testimony in this case.

fact, false, and, if so, (2) whether the testimony was material." *Weinstein*, 421 S.W.3d at 665. The second prong in such a claim is "materiality," it is not "harm." *Id.* False testimony is "material" only if there is a "reasonable likelihood" that it affected the judgment of the jury. *Id.* The applicant's burden in a false evidence claim is to show these things by a preponderance of the evidence. *Id.*

Applicant fails to meet his burden. To be sure, Applicant presents some new evidence that could serve to rebut the accuracy of the testimony he takes issue with from his trial. But the defense also presented other evidence at his trial tending to rebut the accuracy of that same testimony, and that did not make a difference. The new evidence that Applicant relies upon is not conclusive evidence that the testimony presented at his trial was false.[3] Instead, like all evidence, it would have to be considered and weighed by a jury in addition to all the other evidence presented at Applicant's trial.

Also, this new evidence does nothing to rebut the very compelling historical-fact-based evidence showing that Applicant's family died inside their home when it burned down, that Applicant had the motive,

---

[3] For instance, Dr. Gill-King completed an affidavit regarding his trial testimony in this case that Applicant's son suffered "blunt force trauma." In that affidavit, Gill-King says he has no doubt that the jurors *heard* his testimony as "Brady had been hit, and hit hard," by another. But the convicting court makes clear in its findings that Gill-King did not commit perjury. According to the convicting court Gill-King "clearly had an opinion about what caused that bruising[,]" but it concluded that Gill-King "did not possess" the expertise to offer that opinion. Thus, the convicting court concluded, Gill-King "gave the jury the false impression that his expertise included the area of soft-tissue analysis when in fact it did not." Findings of Fact and Conclusions of Law, Finding # 114, at 47.

the intent, and the opportunity to kill his wife and children by burning down their house with them in it when they died, and that Applicant's highly suspicious behavior and odor at and around the time of the fire demonstrated that he was indeed responsible for their deaths. It is this evidence that most compellingly shows that Applicant is guilty, and it is this evidence that the jury likely placed the most weight on in finding him guilty. Therefore, I cannot conclude that Applicant's new rebuttal evidence was material in the sense that it creates a "reasonable likelihood" that the evidence he claims was false affected the judgment of the jury. *Weinstein*, 421 S.W.3d at 665; *Chaney*, 563 S.W.3d at 263–64.

### III. CONCLUSION

For all the reasons I have stated here, I respectfully dissent to the Court's order granting Applicant relief in this case.[4]

**FILED:**  May 22, 2024
**PUBLISH**

---

[4] By finding Applicant actually innocent, the Court avoids discussing his other grounds for relief. But the convicting court rejected Applicant's actual innocence ground and recommended granting relief on Applicant's new science and false evidence grounds. Like the convicting court, I have rejected Applicant's actual innocence claim, but unlike the convicting court, I have also rejected his new science claim, and his false evidence claim. The convicting court also rejected Applicant's claims in his fourth, seventh, eighth, ninth, tenth, and eleventh grounds. I agree with the convicting court that Applicant has not shown himself to be entitled to relief on those grounds either.