**Affirmed as Modified and Opinion Filed June 16, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-14-01423-CR
_____

## JAMES MITCHELL, Appellant
## V.
## THE STATE OF TEXAS, Appellee

_____

### On Appeal from the 283rd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F-1352061-T

_____

# MEMORANDUM OPINION
Before Justices Bridges, Francis, and Lang
Opinion by Justice Francis

A jury convicted James Mitchell[1] of capital murder in the robbery-beating death of a seventy-two-year-old woman. Because the State did not seek the death penalty, punishment is life in prison without parole. In four issues, appellant complains about the sufficiency of the evidence to support his conviction and the admission of certain evidence. For reasons discussed below, we conclude all issues are without merit. Further, on our own motion, we modify the trial court's judgment to reflect no possibility of parole. We affirm the judgment as modified.

On January 31, 2013, the family of Mouda Erskine had been unable to contact her throughout the day despite several attempts. That evening, Erskine's sister, Marva Miles, and a friend went to Erskine's house and found her body on a hallway floor. Erskine had been beaten

_____

[1] The record contains multiple variations of appellant's middle name: Ramsey, Ramesy, and Raamsey. Because we cannot discern which if any of the spellings is correct, we refer to appellant simply as James Mitchell.

repeatedly in the head and face with a hammer or other unknown object. Her 2005 Nissan Altima was missing.

One of Erskine's neighbors, Gregory Boyd, gave appellant's name to the police as a possible suspect. Boyd had lived next door to Erskine for five years and talked to her daily. He reported that two days earlier, he overheard an argument between appellant and Erskine. At the time, Boyd was outside in his driveway, and appellant and Erskine were in Erskine's house. According to Boyd, appellant was loud, aggressive, and angry, and was demanding that Erskine give him money. Boyd could not hear Erskine's response. Later, Boyd saw Erskine and asked if everything was all right. Erskine told him "it was nothing she couldn't handle." Boyd was concerned but did not press the issue.

The next day, Boyd saw appellant sell one of Erskine's cars, an "old beat up" Cadillac that had been parked in her back yard for years. Appellant told him he got $300 for the car. That same day, he saw appellant load a large flat-screen TV from Erskine's house into a car and leave. He later learned appellant took the TV, which did not work, and some jewelry to a pawn shop to sell. On both occasions, Erskine saw what was going on and did not object.

Boyd testified that in the days after the argument, he was concerned about who was going into Erskine's house because he saw appellant "coming back and forth late at night" after Erskine went to sleep. Boyd saw Erskine for the last time at around 7:30 a.m. on January 31 as he was leaving for work.

Like Boyd, Erskine's family did not trust appellant and was concerned about the time he spent at her house. They said he went to Erskine's house for meals and a place to stay but did not help Erskine with anything. Erskine's son, William Harper, explained that appellant was the grandson of a woman he was married to several years earlier. After they divorced, Erskine had remained friends with the woman and then met appellant when he was a small child. When

Harper could not reach his mother on the 31st, he contacted Boyd, who told him he had seen her that morning and her car was in the driveway.

Police collected three hammers and other evidence at the crime scene and took photographs showing blood spatter on the walls and ceiling. They also put out a bulletin on Erskine's vehicle and began to try to locate appellant. The day after Erskine's death, police received a tip and arrested appellant while he was sitting in a car outside an apartment complex in downtown Dallas. Erskine's Altima was found on another street nearby. Gregory Norwood was sitting in the driver's seat and was detained by the police. After checking Norwood's alibi, police ultimately determined he was not involved in Erskine's death.

Norwood, a musician, told the jury he and appellant were friends from being in the music industry and Norwood knew him by his stage name, "Abstrakt Sir 'Real' Koncept." He saw appellant at a club late on the night of the January 31. Appellant bought drinks for him and some other people. After appellant watched Norwood perform, he asked Norwood to go to California with him and said he would introduce him to his contacts. Appellant told Norwood he was leaving that weekend and Norwood agreed to go. When they left the club that night, they got into the Altima, which appellant described as his "new car."

The next day, appellant wanted Norwood to drive him in the Altima to a downtown apartment complex to meet a friend. As they entered downtown, Norwood said he noticed police cars at every corner but "didn't pick that up." He parked the car, and appellant's friend pulled up in front of them. As appellant got out of the car, he handed Norwood some jewelry, told him to hold it for him, and said he would be back in ten minutes. Appellant got into the other vehicle, and they drove away. Less than five minutes later, the police came up to the Altima and detained Norwood. The police recovered the jewelry that appellant handed him. One of the pieces was a ring belonging to Erskine and another was a watch belonging to Erskine's aunt.

After appellant's arrest, police collected the clothing he was wearing and found earrings belonging to Erskine's aunt in his sweater pocket. Detectives sent the clothing to the SWIFS laboratory for testing. Analysis revealed that every piece except his belt—shirt, sweatshirt, sweater, both shoes, both socks, and pants—tested presumptively for blood. Samples of that clothing were then submitted for DNA analysis, which showed that appellant's shirt, sweater, and right shoe contained DNA profiles of both Erskine and appellant. Erskine was the major contributor, and appellant was the minor contributor. Appellant's left shoe contained only Erskine's DNA.

The three hammers collected from the crime scene were also analyzed. All three tested presumptively for blood. One of the hammers, found on the living room couch, tested conclusively for blood. Two samples taken from the hammer were submitted for further analysis, and a DNA profile was obtained. The first sample, taken from a stain on the hammer, was a mixture of two individuals: Erskine was a major contributor and appellant was the minor contributor. The second sample, a swabbing taken in an attempt to collect skin cells of anyone who held the hammer, had low levels of DNA that could not be resolved into a major and minor contribution. However, both Erskine and appellant were included as possible contributors to the mixture; Norwood was excluded as a possible contributor.

In addition to the forensic evidence, police obtained the records from appellant's cell phone. Those showed that between 3:35 a.m. and 9:03 a.m. on January 31, calls on appellant's phone originated and ended at the cell phone tower closest to Erskine's home. Text message records showed that for most of the day on January 31, appellant was trying to sell Erskine's Altima. That morning, he began by asking $2000 but dropped the price to $300 by early evening because he could not produce a car title.

An autopsy showed Erskine died as a result of blunt force injuries to the head. The medical examiner identified at least two dozen separate blows to the face and head; eleven caused fractures. Almost all of the wounds were "full thickness lacerations," meaning they went through the skin or scalp. The medical examiner said many of the wounds left a distinct curvilinear pattern, consistent with the shape of a hammer, although other "hard objects" could cause a similar pattern. The medical examiner said his examination did not show any "definitive defensive injuries," indicating Erskine did not have much of an opportunity to defend herself.

Appellant denied killing Erskine. He said he had known her since childhood and called her "Mama Mouda." In May 2012, he went to California to pursue an offer from a music label. After he returned to Dallas, he stayed with Erskine "off and on" because he wanted a "home type feel" and his own grandmother was living in Austin. His plan was to go back to California.

Since he had last seen her, appellant said Erskine's sister Rosanna had died and Erskine was living alone in the house. He said they spent a lot of time talking, and Erskine confided in him that she was "strapped for cash." Appellant offered her money, but she refused to take it. He said it was Erskine's idea to pawn the TV and jewelry and sell the old Cadillac. He was unable to get any money for the TV and jewelry because the TV did not work and the jewelry was "all fake." On the same day, he found a buyer for both her Cadillac and Altima on Craigslist, but decided to buy the Altima himself. Appellant testified he gave her the $300 he got for the Cadillac and then gave her $2000 of his money for the Altima. Appellant said he told Erskine she could keep the Altima and he would use it when he was in town. He did not get a title to the car, he said, because he did not have a driver's license. Also, it "didn't matter" because he and Erskine had a "mutual arrangement" and he did not need legal title.

After buying the car, he "just kind of celebrated" and spent the night of January 30 with two female friends. The next morning, between 8 and 9, he went back to Erskine's house

because he had a "strange feeling." Appellant said he was driving the Altima. When he arrived at the house, he said the door was "kind of cracked open." He called Erskine's name, but she did not answer. Erskine's dog was "whimpering" under the table and appellant said he felt a "weird energy." As he walked toward the dog, he noticed the door to the hallway was closed and there was a blood stain on the door. He opened the door and found Erskine lying in the hallway with blood all over her face. Appellant said it took about five minutes for him to get the nerve to check her, and when he did, she did not have a pulse.

Appellant looked around to see if someone else was in the house. Then, he "freaked out" and locked the doors, thinking the assailant might be outside. He grabbed a picture of his deceased mother, set it on the living room table, and tried to "tune in" to her to figure out what to do. When he did not get a "response," he left. Appellant drove to DeSoto to talk to his godmother, who owned a law firm, but she was not available. He acknowledged that "pretty quickly" after discovering the body, he began trying to sell the Altima, explaining that since he was "caught up in this big crappy mess" he could "at least" get his money back for the car. Appellant said he "screwed up" by not calling the police or ambulance, but he did not think anyone would believe him.

In his first two issues, appellant contends the evidence is insufficient to prove that (1) he was the person who killed Erskine and (2) the murder was committed in the course of committing or attempting to commit robbery.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v.*

*State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id*. For purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are treated equally. *Id.*

As set out in the court's charge, a person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.02(b), 19.03(a)(2) (West 2011 & Supp. 2014). A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id*. § 6.03(a). Intent to murder can be proven through circumstantial evidence of the defendant's acts and words surrounding the crime. *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, the person intentionally or knowingly causes bodily injury to another. *Id*. § 29.02(a). A person commits theft if he appropriates property without the owner's consent and with intent to deprive the owner of the property. *Id*. § 31.03(a), (b)(1) (West Supp. 2014).

The court of criminal appeals has interpreted the "in the course of committing" an offense language to describe conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989). The State must prove a nexus between the murder and the theft, that is, the murder was committed in order to facilitate the taking of the property. *Cooper v. State*, 67 S.W.3d 221, 223 (Tex. Crim. App. 2002); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.

Crim. App. 1986). The identity of the alleged perpetrator may be proven by circumstantial evidence. *Orellana v. State*, 381 S.W.3d 645, 653 (Tex. App.—San Antonio 2012, pet. ref'd).

Appellant first complains the evidence is insufficient to establish that he was the person who killed Erskine. Appellant was charged with intentionally causing Erskine's death by striking her with a hammer or other unknown object. Appellant contends he found Erskine dead, there were no eyewitnesses to the murder, and the State's evidence was "entirely circumstantial."

The evidence showed Erskine was found dead and her car missing two days after appellant was overheard demanding money from her in a loud, aggressive, and angry tone. Erskine's blood and appellant's DNA were found on a hammer that jurors could reasonably believe caused Erskine's injuries, and Erskine's DNA was found on appellant's sweater, shirt, and the top of one of his shoes. Cell phone records indicate appellant was, at the very least, in the vicinity of Erskine's house within thirty minutes of when she was last seen alive and had begun trying to sell her car. He spent the entire day trying to sell the car, going from a high asking price of $2000 that morning to the low price of $300 by that evening because he could not produce a title.

Appellant attempts to explain away some of the incriminating evidence by arguing that (1) he touched Erskine after finding her in a pool of blood, which could account for Erskine's DNA on his clothing, (2) he had previously touched one of the hammers in Erskine's house making a repair, which could account for his DNA on the hammer, and (3) the medical examiner could not say with certainty what object had killed Erskine, only that her injuries were consistent with a hammer or other hard object. He also argues that no testing was conducted on material that may have been under Erskine's nails or eight blood samples, which he contends undermines the State's circumstantial evidence case. Finally, he relies on his testimony that he did not argue

with Erskine over money. Given the evidence that Erskine "was seen giving him a car and TV to sell," he argues it was not logical to deduce he was stealing her possessions.

The jury, however, was not required to believe appellant's version of the events and apparently did not. Nor does the State's failure to test certain evidence render the remaining evidence insufficient. Viewing all of the evidence in the light most favorable to the verdict, we conclude a rational jury could have determined beyond a reasonable doubt that appellant was the person who murdered Erskine. We overrule the first issue.

In his second issue, he contends the State failed to prove he killed Erskine in the course of committing or attempting to commit robbery. He asserts the State failed to prove he took Erskine's property without her consent or if he did take her property, that there was any nexus between the taking and her murder.

Within the body of his brief, appellant's argument focuses solely on the Altima as the stolen property. Relying on his own testimony, he contends he paid Erskine for the car and had an arrangement that she would keep it while he was out of town. But, he argues, even assuming the State proved theft of the car, the evidence failed to establish that he killed Erskine to facilitate the taking of her car because there is no evidence as to exactly when he took possession of it.

Erskine's next door neighbor, Boyd, testified he saw Erskine for the last time at about 7:30 a.m. January 31. Erskine's son said that when he could not reach his mother on the 31st, he called Boyd. Boyd told him he had seen Erskine that morning and her car was in the driveway. Just after 8 a.m., appellant had already begun trying to sell the car, and continued those efforts throughout the day with the price dropping dramatically when he could not produce a car title. When family members found Erskine's body later that day, her car was missing, and they explained she did not let other people drive it.

From these facts, coupled with evidence that appellant was loud and aggressive in demanding Erskine give him money only two days before her death, the jury could have rationally found appellant committed the murder in the course of committing or attempting to commit robbery. The jury could disbelieve appellant's story that he had purchased the car from Erskine two days earlier and was only trying to recoup his money after he found her dead. Appellant also argues there was evidence that he possessed her car on the night of the 30th, so even if he had no right to drive the car, his possession of it was "unconnected" to Erskine's death since it occurred "substantially before" her death. Even if appellant possessed the car on the night before Erskine's death, Erskine had regained possession before she died as established by testimony that the car was in her driveway when Boyd saw her that morning. We overrule the second issue.

In his third and fourth issues, presented together, appellant contends the trial court abused its discretion by admitting speculative testimony and permitting improper cross-examination.

At trial, Erskine's sister, Miles, testified some of the jewelry recovered belonged to their aunt, who lived with Erskine but died some months before Erskine was killed. During her testimony, Miles was permitted to give her opinion that those items were important to Erskine over the defense's objection that it called for speculation. On further redirect, Miles was allowed to testify, over an objection the testimony was "outside the scope of cross," that she had conversations with Erskine about the jewelry.

In his brief, appellant provides a brief standard of review regarding the admission of evidence, but he does not present any law regarding speculative testimony or the proper scope of cross-examination. Moreover, he does not analyze why Miles's testimony is necessarily speculative nor does he explain why her later testimony was "outside the scope of cross."

An appellant's brief must contain a clear and concise argument for the contentions made with appropriate citations to authorities and the record. *See* TEX. R. APP. P. 38.1(i). Because appellant's issues fail to provide any substantive analysis supported by legal authority, we conclude his issues are inadequately briefed. *See id*; *see also McCarthy v. State*, 65 S.W.3d 47, 49 n.2 (Tex. Crim. App. 2001) (stating inadequately briefed issue may be waived on appeal). We therefore conclude issues three and four present nothing for review.

Finally, although neither party has raised the issue, our review of the record reveals an error in the trial court's judgment. The judgment reflects the punishment as life, not life without parole. A person convicted of a capital felony in a case where the State does not seek the death penalty shall be imprisoned in TDCJ for life without parole if the person who committed the offense is eighteen years of age or older. TEX. PENAL CODE ANN. § 12.31(a)(2) (West Supp. 2014). Appellant was nineteen years old when he committed the offense. Because appellant was older than eighteen and the State did not seek the death penalty, punishment is life in prison without parole. *Id.*

We have the authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the trial court judgment to reflect punishment is life without parole.

We affirm the trial court's judgment as modified.

Do Not Publish
TEX. R. APP. P. 47.2(b)
141423F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JAMES MITCHELL, Appellant

No. 05-14-01423-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1352061-T.
Opinion delivered by Justice Francis; Justices Lang-Miers and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect punishment as life without parole.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered June 16, 2015.