**AFFIRM; Opinion Filed March 13, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00193-CR**

**JOSEPH KIM, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-34581-U**

## MEMORANDUM OPINION

Before Justices Myers, Schenck, and Carlyle
Opinion by Justice Myers

Appellant Joseph Kim was indicted for indecency with a child by contact and

sexual assault of a child. A jury found him guilty of indecency with a child and

assessed punishment at confinement for two years and a $10,000 fine. Appellant

filed a motion for new trial. Following a hearing at which appellant presented

evidence, the trial court denied the motion. In one issue, appellant contends the trial

court abused its discretion by not granting a new trial because he was denied due

process and due course of law. We affirm.

### BACKGROUND

The record in this case shows that the complainant was born in Korea and that

she and her parents immigrated to the United States when the complainant was three years old. After her parents separated and her father returned to Korea, the complainant's mother started dating appellant, who also immigrated to the U.S. from Korea. Appellant and the complainant's mother got married in 2009, during the summer between the complainant's third and fourth grades, after which the complainant and her mother moved in with him. The complainant's mother was over fifty when she married appellant; he was in his late sixties.

Twenty-one years old at the time of trial, the complainant testified that appellant, her stepfather, maintained a strict, traditional Korean household. She was not allowed to date or participate in various social activities, like attending homecoming or prom, and she found these restrictions very frustrating.

The complainant testified that around the time when she was in the eighth grade, her mother and appellant moved her bed into their bedroom. The complainant's mother told her they did this to keep her safe because one night a gunshot had gone through their front door and the alarm sounded. Even before this incident, however, the complainant testified that she had started to feel uncomfortable around appellant because every morning and night he would put his hand on her "butt," outside of her clothing, and ask her to give him a kiss on the lips. As she grew older, appellant would try to force his tongue into her mouth. The complainant said her mother witnessed this behavior and told her it was normal for a father to do that.

In the mornings before she went to school, while her mother was walking in a nearby park, appellant would touch the complainant by putting his hand on her butt. The complainant said this became "my normal routine." When she took a shower, he would enter the bathroom (he never allowed her to lock the door), tell her to turn around, and put his hands on her breasts. The complainant said that she told her mother about this, and her mother replied that appellant was just trying to see if her breasts were "getting bigger." The complainant testified that she was sixteen years old when this occurred. At night, appellant would lay on his back while using his iPad or reading a book and rub the complainant's butt on the outside of her clothing or put his hand on her leg "and just feel around," after which the complainant would go to sleep. The complainant's mother was typically in the bathroom getting ready for bed when this occurred, but she was sometimes present when appellant touched the complainant. The complainant testified that she told her mother "many times" that this behavior made her feel uncomfortable, and her mother "just said that this is how dads show their love to their daughters."

As the complainant grew older, the touching progressed from kissing her and touching her butt to putting his fingers in her vagina. On one occasion, when she was fifteen or sixteen years old and they needed to go to the grocery store, the complainant asked appellant if they could use the bigger car, a Mercedes, instead of the smaller, uncomfortable pick-up truck appellant often drove. Appellant told the complainant that if she wanted him to take the bigger car he would have to put his

fingers in her vagina, so the complainant got on her knees, pulled down her pants, and appellant put his fingers inside her vagina for about two or three minutes. Then appellant stopped and the complainant "got ready to go."

The complainant eventually told her aunt, Choon Soh Park, about the abuse, and this was the first time she had told anyone what was happening. She moved in with her aunt Choon and her uncle, who lived in a house on Carver Lane in Irving, only a five to eight minute drive from appellant's house on Cheyenne. Appellant owned both properties. The complainant and her aunt met with a lawyer who was a family friend, Jason Choe, in 2014, before they told anyone at school or the police about the abuse. The complainant testified that they met with him "[b]ecause he was a friend of ours, and maybe he could help us and see what options we had." Based on his advice, the complainant went to see her school guidance counselor. She told the counselor everything that was happening at home, and the counselor brought her to see the school resource officer, who in turn contacted an investigator with the Children's Advocacy Center. The complainant was interviewed at the Advocacy Center and charges were filed.

The complainant testified that she never went back to see Choe after that 2014 meeting, but they talked on the phone. However, the complainant said that she also consulted with another attorney, Brian Min, and likewise told him everything that had happened. The complainant testified that she did not want to pursue any kind of civil suit against appellant, that she did not have any interest in money from him,

and that if an attorney took action on her behalf she was not aware of it:

> Q. [STATE:] What happened with Mr. Min?
>
> A. So, with Mr. Min, it was the same with Jason Cho[e]. I told him everything that happened, and he wanted to do—he wanted to sue them, my mom and stepdad. I said, no, that I did not want to go forward with that, that I just wanted to bring him to justice, that's it.
>
> Q. So do you know if a lawsuit was ever filed?
>
> A. I have no idea.
>
> Q. Do you want to pursue any kind of civil suit?
>
> A. No.
>
> Q. Do you have any interests in money from your stepdad?
>
> A. No.
>
> Q. If an attorney had taken actions, were you aware of those actions?
>
> A. No.

The complainant acknowledged during cross-examination that a lawsuit was filed on her behalf by Choe in Dallas County in November of 2017, but she testified that she "never signed anything," and he filed that lawsuit without her knowledge or permission:

> Q. [DEFENSE COUNSEL:] You testified yesterday that the only time you spoke with Mr. Choe is that one meeting in 2014?
>
> A. We met, yes, in person, and then we had a phone call.
>
> Q. What was the phone call?
>
> A. The phone call was just him asking what I wanted to do, and I told him I wanted to go and talk to the guidance counselor at the school.
>
> Q. This would have been in 2014?

A. Yes.

Q. So you're saying following that, you had no conversation with him?

A. Not myself, no.

Q. What does that mean?

A. After the meeting with him and the phone call, I didn't speak with him again.

A. Okay.

DEFENSE COUNSEL: May I approach the witness?

THE COURT: Yes.

Q. Have you seen this before?

A. Yes.

Q. What is it?

A. It's me suing my mom and my stepdad.

Q. So this is a lawsuit filed in Dallas County on your behalf, correct?

A. Yes.

Q. Filed by Jason Choe?

A. Yes.

Q. That's the attorney we're talking about?

A. Yes, but I never signed anything.

Q. He's your attorney, right?

A. Yes, but I never signed anything with him.

Q. And this was filed in November of 2017, correct?

A. Yes.

Additionally, the complainant testified:

Q. [DEFENSE COUNSEL:] You do recognize, however, the lawsuit has been filed in your name?

A. Yes, we are aware of that, but I never signed that document, and he sent that without telling us.

Q. So the allegation that you're making now in this court is that Jason Choe, a licensed attorney in the state of Texas, has filed a lawsuit in your name without your consent or authority?

A. Yes. He got that document from Brian Min, and I told Brian Min I would not like to go forward with that because I did not want to sue them.

The complainant identified defense exhibit 9 as an email that Min sent to her and Jason Choe on the afternoon of December 13, 2016.[1] The email said: "As you requested, we have terminated our contingency fee agreement and delivered your case file to Mr. Jason Choe's office. Please see confirmation of delivery of your file." The complainant testified that when she and Min met, they "talked about what had happened between me and my stepfather," and Min asked her if she "wanted to follow through with the civil case." Min had drafted a petition but she told him that, no, she did not want to sue "them," and she was not pursuing money: "When Brian and I met, we talked about what had happened between me and my stepfather. He asked me if I wanted to follow through with the civil case, and I told him, no, that I did not want to sue them, I was not pursuing any money." The complainant said she did not have any contact with Min after that because "we did not want to go forward

---

[1] She testified that she turned this document over to the prosecutor the week before trial; it was admitted into evidence.

–7–

with anything with a civil case." The complainant testified it was her aunt Choon who had asked Min to send the case file to Choe, and the complainant never spoke to Choe about this.

The complainant testified she had "no idea" the lawsuit filed by Choe sought damages of over a million dollars, and she denied telling her other aunt, Chin Haynen, that they were false allegations. She also denied telling her stepsister, Julia Kim, that her aunt Choon and her uncle were "in this" to get money from appellant. The complainant was shown defense exhibit 10, her email response to Julia dated December 29, 2015, saying, in response to a question from Julia asking if the complainant was still living in the house on Carver Lane (that appellant owed), "They're in this for the money from [appellant]." The complainant testified that she never thought her aunt and uncle were "in it" for the money. She clarified that the email was referring to her mother's other siblings, her aunt Chin Haynen (who lived in Seattle) and her uncle James Kim (who lived in New York), because appellant was giving them financial support. The complainant testified that her Seattle aunt was "very close to my mom," and the complainant noticed that the aunt had a new Mercedes that was just like the one her mother drove. The complainant believed appellant gave her aunt Chin that car to keep her on his side.

The complainant testified that she was not making up the allegations because she wanted to get away from her parents' strict rules, nor because her aunt Choon wanted money from appellant. The complainant insisted that she wanted the case to

be litigated in criminal court and that if she or her aunt had wanted to file a civil case against appellant "we would have gone through with it." The complainant explained that she wanted the case litigated in criminal court because she wanted "him to feel the embarrassment that I have felt from him," and that she wanted "to find justice against him" because "[h]e did horrible things to me." She added that "[h]e is a horrible person." The complainant admitted she had called the detective on the case and asked him if the case was filed "under a rape allegation," because she did not consider what occurred to be rape, and because her "Seattle Aunt kept saying I made false accusations." The detective told her it was filed as indecency with a child. Toward the end of her testimony, the complainant said it was important that the truth and only the truth be presented, after which she testified as follows:

> Q. [STATE:] Now, what went on in that house, the touching went on for a long time?
>
> A. Yes.
>
> Q. When you were 14, was he touching your breasts with his hands?
>
> A. Yes.
>
> Q. Did that happen once or many times?
>
> A. It happened twice that I remember, yes.
>
> Q. When you were 15, did he penetrate your vagina with his fingers?
>
> A. He put his fingers inside, yes.
>
> Q. Okay. Did that happen when you were 15 or about that time?

A. It was about that time when I was going into high school, yes.

The defense provided testimony from appellant's relatives, including his daughter (the complainant's stepsister), his wife (the complainant's mother), the complainant's aunt Chin Haynen (the Seattle aunt), and her uncle James Kim (the New York uncle). Also testifying were appellant's pastor, Sung Chul Lee, and Winston Line, appellant's attorney in the civil suit filed against appellant. Line testified that he had filed an answer in the suit, which was filed in the complainant's name in 2017 (when she was an adult) against appellant and the complainant's mother in Dallas County District Court. Line testified that the suit, which sought damages, had been abated pending the outcome of the criminal case. Line also testified that an attorney filing a suit like that without the adult plaintiff's consent would be committing a serious breach of legal ethics and risking disbarment.

During their arguments to the jury, both parties addressed the issue of the complainant's alleged financial motivation to pursue a criminal case against appellant, and in particular the pending civil suit. During its opening statement, the State framed the issue like this:

> You'll also hear that in the beginning, [the complainant's] aunt—and she didn't really know what to do, how to address this in the American legal system, so the first thing they did was go see a lawyer. That lawyer filed a civil suit. That suit has been abated, and [the complainant] will tell you, she had no interest in that. She wanted to pursue criminal charges, and so she asked for that to stop.

Defense counsel told the jury:

–10–

It came to a point and [the complainant] wants to leave the house, and she goes to the Parks [her aunt and uncle]. They come and get her. They take her. They take her to the house they live in, which, oh, by the way, is [appellant's] house. [Appellant] was nice enough to rent them a house in Irving at below market rate. He owns a lot of property in the community. He had another house. He let the Parks live there and charge them way below market rate. They repay that by accepting his stepdaughter into their house, fabricating a story against him, dangling the story in front of the some civil lawyer before they ever go to the police, figure out there's a way to get money at the end of this story. . . .

During its closing argument, the State argued as follows:

Now, opposing counsel is going to talk a lot about this civil suit. Her aunt is a liar. Her aunt wants this money. Everybody wants money from the defendant and that's the reason that she made up these allegations. Well, you didn't hear any testimony that your verdict today is going to affect that civil suit. Even though that civil lawyer testified about what he believes every lawyer should aspire to be in their practice, you didn't hear that the outcome of this trial automatically gets a check to [the complainant] or her aunt. And believe me, if that evidence existed, you would have heard it.

So there's no connection between this verdict and the civil suit, and you heard repeatedly from these witnesses that they really didn't consent to a civil suit being filed, and there might be some confusion between what [was] happening on the lawyer's end and the client's end. I think if there's anything that all 12 of you and everyone in this courtroom is sure of, is that language presents a challenge in this case. So if you have attorneys that don't understand their clients, clients who aren't sure how to work the legal system, you just don't have enough evidence to show that [the complainant] coming to her aunt . . . was motivated by money. Okay.

The jury ultimately acquitted appellant of sexual assault of a child but convicted him of indecency with a child, assessing punishment at two years' confinement and a $10,000 fine.

Appellant filed his motion for new trial on February 13, 2019, and it included

exhibits and excerpts from trial testimony. Appellant filed an amended motion for new trial on March 11, 2019, alleging in part that "[t]here is every appearance" he "did not receive a fair trial in that the jury did not hear persuasive evidence the Complainant was untruthful about her motivations to see" attorney Jason Choe, "and that the complainant was actively pursuing a civil lawsuit while telling the Assistant District Attorney her only motive was to seek justice." Appellant also provided documents showing a civil suit in the complainant's name had been filed against appellant and the complainant's mother in Dallas County by Choe (cause number DC-17-15192) on November 3, 2017. Exhibit G was an email from the prosecutor to defense counsel dated February 21, 2019, regarding a visit to her office by the complainant's aunt Choon. The email reads as follows:

> Both cases were tried in front of Judge Michael Snipes the week of 2/5/19. The jury rendered a NG verdict on the Sexual Assault case and a Guilty verdict on the Indecency case. They sentenced the Defendant to 2 years in prison. During the trial, the defense argued that [the complainant] and her family were motivated by money and referenced a pending civil suit. In her testimony, the [complainant] made clear that she was not interested in money, or pursuing a civil suit, but only wanted justice for what had happened in the past. Today (2/21/19), Choon Soh Park [the complainant's aunt] and her son, came to meet with me. lnv. Michael Swain was present. The [complainant] was not present. Aunt stated that she wanted to hire a civil attorney for the [complainant] to pursue a civil claim. She asked about hiring my husband, who is a civil attorney, or if I could recommend a civil attorney. I explained that I could not recommend a civil attorney for her, and that I believe it would [be] unethical for me to do so. I further explained that my husband does not do that type of work, but more importantly it would be unethical for me to refer the case to him. She stated that she had asked the [complainant] to text me about hiring a civil attorney, but since the [complainant] had not done so, the Aunt

–12–

wanted to come meet with me. I have received no texts from the [complainant] asking about a recommendation for a civil attorney. She has my county issued cell phone number and we have communicated in the past via text. After our meeting, I contacted defense attorney, Jeff Boncek, and relayed this information, and am sending him this case note via email.

The same judge presided over both the trial and the motion for new trial hearing. At the beginning of the motion for new trial hearing on April 19, 2019, the trial judge informed the defense that on the day before he had received a call from the prosecutor about "certain Giglio[2] information by way of impeachment, that had come to her attention regarding the complaining witness." The relevant portion of the record reads as follows:

> [PROSECUTOR]: Your Honor, in our initial trial, the defense—a large part of Defense's argument was that the complaining witness was motivated by a desire for money from the defendant and filed a civil suit defaming him, alleging in the lawsuit and asking for money. In trial, when asked by [defense counsel] "Are you interested in money," she said, "no" emphatically.
>
> When I spoke with her yesterday on the phone, she was very, very upset. She explained that, to her, it wasn't simply black or white. When the case was initially filed by Mr. Choe, I believe, he had let her know that they needed to file the case due to statute of limitations. She had okayed that. After that, the case was abated—or while the criminal trial was pending.
>
> When I spoke with her yesterday, I said, "[Complainant], what do you want to happen?" I said—excuse me. I first said, "[Complainant], why do you think the civil case was filed? What's the purpose?" And she said, "For money or for property." After that, I said, "[Complainant], what do you want to happen with the civil trial?" And she said, "I want

[2] *See Giglio v. United States*, 405 U.S. 150, 150–55 (1972) (granting defendant a new trial on due process grounds where the Government failed to disclose a promise of leniency made to its key witness in return for his testimony).

–13–

him to be held accountable. I want him to go to prison. I think he should pay for my college. I don't understand why he has gotten away with so much, why I have been hurt so much? And so I do want to go forward with the civil suit."

THE COURT: And all that was developed in a very significant manner during trial?

[PROSECUTOR]: Yes, sir.

Attorney Brian Min testified that his relationship with the complainant and her aunt began on approximately January 5, 2016, when the complainant and her aunt Choon came to see him. They discussed the complainant's desire to file suit against appellant, and Min assisted the complainant with the victim impact statement that was sent to the office of then District Attorney Susan Hawk. Min's contract with the complainant was on a contingency basis, so it was a suit for money. He is not a criminal defense lawyer "or anything like that." They never talked about specific dollar amounts, and he drafted but did not file the civil lawsuit. He testified that the complainant fired him in December of 2016 and instructed him to send the case file to Jason Choe, who would "take over from there." The lawsuit was not terminated; the file was simply transferred to Choe. That was the extent of Min's involvement in the case. He said the complainant's testimony that she told Min "everything that had happened," that he wanted to sue both her mother and appellant, that she said, no, she did not want to do that, and that she just wanted to bring appellant to justice, was untrue based on his knowledge. Min testified that the complainant indicated the purpose of the lawsuit was to get money, and that she

–14–

needed money to go to college.

Choe testified that he had known the complainant since she was a child because her aunt and uncle operated a dry cleaner and Choe was a customer there. He met with her at his office in 2014, but it was not a scheduled client appointment. At that point, according to his testimony, she was not a client and he was not her attorney. He testified that the complainant was consistent "[f]rom the very beginning" of their conversations that "[s]he had been abused." But when asked about the complainant's trial testimony, Choe testified that, based on his knowledge, significant portions of her testimony were untrue, including that she had "no idea" whether a lawsuit was ever filed; that she did not want to pursue any kind of lawsuit; that she did not have any interest in money from appellant; and that she was not aware of actions by an attorney:

> [DEFENSE COUNSEL]: Q. . . . She's answering these questions. This is her under oath testimony. She says, "Do you know if a lawsuit has ever filed?" She says, "I have no idea."
>
> Is that a true statement from the complainant?
>
> A. (No response).
>
> Q. Based on your knowledge?
>
> A. Based on my knowledge, it would be, "no."
>
> Q. "Do you want to pursue any kind of civil lawsuit? No."
>
> Is that based on your knowledge of your interactions with the complainant?
>
> Is that a true statement she is making to the Court?

A. It is not.

Q. "Do you have any interests in money from your stepdad?  No."

Is that a true statement, based on your knowledge of interactions with the complainant in this case?

A. That is not.

Q. ["]If an attorney had taken answers, were you aware of those actions?  No."

Is that true statement.

A. Based on what I know, it's not.

Q. And Exhibit [P] says:  You only met with Mr. Choe one time?  And we had a phone call.  And then he asked, What was the phone call?  The phone call was just me asking him asking [sic] what I wanted to do. And I told him I wanted to go and talk to the guidance counselor in school.  Question:  This would have been in 2014?  Yes.  So you're saying that, following that, you had no conversation with him?  Not myself, no.

Is that a true statement by the complainant, based on your interactions with her?

A. It is not.

Q. And, "What does that mean?  After the meeting with him and the phone call, I didn't speak with him again."

And she's talking about 2014.  Did you have a number of conversations with her, after 2014?

A. Yes.

Q. And they were specifically about filing a lawsuit?

A. No.

Choe acknowledged he did not have authority to file a lawsuit in 2014, but he

testified that when he filed the lawsuit on the complainant's behalf in 2017 he "had

her consent and authority." He testified that she wanted to file suit against appellant in 2015, but Choe told her he "was not interested in doing that," so the complainant went to attorney Brian Min. Choe testified that the complainant was confused and upset about the role her mother had played in this matter, and about the effect any legal proceedings might have on her. Choe testified that the complainant returned to him in December 2016 to discuss filing suit against appellant. Min had wanted to file a lawsuit in December 2016 because he thought the statute of limitations would expire. Choe, however, believed the limitations period would expire two years after the complainant's eighteenth birthday, so he filed the lawsuit on November 3, 2017, two days before her twentieth birthday.

Defense counsel questioned the complainant in detail regarding her trial testimony. Under cross-examination by the defense, the complainant explained that her trial testimony that she told Min, "no," she did not want to sue "them," was not false because Min wanted to sue both her mother and appellant, and she only wanted to sue appellant:

> Q. [DEFENSE COUNSEL:] This is Exhibit Q. "What happened with Mr. Min? So, with Mr. Min, it was same with Jason Choe. I told him everything that had happened, and he wanted to do—he wanted to sue them, my mom and my stepdad. I said, no, that I did not want to go forward with that, that I just wanted to bring him to justice, and that's it."
>
> Is that still a true statement? Is that what you told Mr. Min?
>
> A. I believe that is what I told Mr. Min. And the option to sue them did come up.

Q. My question is: You did not want to go forward with the suit—you just wanted to see—have justice done? You didn't want any money; is that a true statement?

A. I did not want to go forward with suing my mom.

Q. Okay. So my question is about Mr. Kim. Did you tell him that you wanted to sue Mr. Kim or not?

A. Yes. I do want to sue Mr. Kim.

Q. Okay. So to the extent this is about Mr. Kim—which I believe it is —that is not a true statement, is it.

THE COURT: Is that a sidebar, Mr. Rogers?

[DEFENSE COUNSEL]: I'm sorry.

A. So in regards to my stepdad, I said that. No, that is not a true statement. I am saying "no" to my mom.

Q. Okay. So that's a mistake. You didn't mean to mislead anybody by saying "no" to your stepdad.

A. Yes. I do want to sue my stepdad—

Q. Okay.

A. —because he deserves no jail time or money.

The complainant testified that when she saw her mother's name on the lawsuit, she thought her mother would go to prison, and that was why she told Min to drop the lawsuit. She denied giving the jury a false impression. The complainant said that she had gone to see a family friend, Jason Choe, when she was approximately sixteen years old, an age at which she did not understand much about the legal system. The complainant testified she had one meeting with him in 2014 and one telephone call after that, and "didn't speak with him again." Later in her

–18–

testimony, however, she suggested that she had misunderstood the questions about how many times she met or talked with Choe:

> Q. [DEFENSE COUNSEL:] And so in Exhibit P, which has been previously admitted, when you say that—you testified yesterday that the only time you spoke with Choe is one meeting in 2014. That's not true, is it?
>
> A. No, it's not. That is not what I mean when I was thinking about our meeting. I was thinking about our first initial meeting.

Emails introduced by the defense from November 17, 2016, November 29, 2016, December 9, 2016, and December 13, 2016, between attorneys Brian Min and Jason Choe, showed that Min had prepared to file a lawsuit against appellant and the complainant's mother, but his services were being terminated, he was directed not to file suit, and he was forwarding the complainant's file to Choe. The December 13, 2016 email from Min to Choe, which was cc'd to the complainant, stated that Choe was scheduled to meet that day with the complainant and her aunt:

> It is my understanding that you are to meet today with [the complainant] and her aunt Choon [ ], and please send me a letter or email confirming that I am to be terminated and directed to not file the attached lawsuit. Please do so.
>
> In the event that I do not hear from you or them today, I will send [the complainant's] file to you as directed by [the complainant] and her aunt.

And later that day, as we noted earlier, Min sent an email to Choe and the complainant confirming the termination of the complainant's agreement with Min

and the delivery of the case file to Choe's office.[3]

The complainant did not dispute these emails sent by her attorneys. She explained that she did not want to sue her mother, and she told Min "I didn't want to make the case because he put my mom's name in the lawsuit." The complainant blamed the fact that her mother's name was on the lawsuit filed by Choe on a "miscommunication," and she said this was the reason she testified at trial that Choe filed the suit without her consent or permission:

> Q. [DEFENSE COUNSEL:] I'd like to show you what's previously admitted as Exhibit N.
>
> (Exhibit tendered to the witness).
>
> And in N, it states that the allegation you're making now in this court is that Jason Choe, licensed attorney, State of Texas, filed a lawsuit in your name, without your consent or authority. I represent to you, that was your testimony in this case. Do you recall that?
>
> A. Yes.
>
> Q. And then you said, yes. "He got that document from Brian Min. I told him I would not like to go forward because I would not like to sue them"?
>
> A. Yes.
>
> Q. Is that statement accurate?
>
> A. Yes.
>
> Q. That's accurate. You wanted to—
>
> A. I did not want to sue my mom, no.

---

[3] Other documents admitted by the defense included a letter dated January 6, 2016, from appellant's attorney to the complainant's aunt Choon and her uncle, giving them thirty days to vacate the property on Carver Lane, which appellant owned.

Q. So—

A. But her name was still in the lawsuit, when Jason [Choe]—when Jason got the file. And I was honestly surprised that my mom's name was still in there. There was a lot of miscommunication in this.

Q. Did you say any of that to the jury on the day of trial?

A. No, I did not.

Q. When you were going to trial?

A. No, I did not.

Q. So you led them to believe you did not want to file a lawsuit?

A. Honestly, I don't remember most of the things.

Q. Okay. So—but this is accurately your testimony?

A. That is my testimony, yes.

Q. You did authorize Jason Choe to file a lawsuit on your behalf?

A. Yes.

However, the complainant maintained that her trial testimony that she had no idea a lawsuit had been filed on her behalf was correct, and this was why she tried to hire a civil attorney to sue appellant after the jury's verdict:

Q. [DEFENSE COUNSEL:] I would like to show you what is Exhibit Motion for New Trial O, for Oscar.

(Exhibit tendered to the witness).

"So do you know if a lawsuit was ever filed? I have no idea."

A. Yes. I had no idea, I really didn't.

Q. So you did not—when you authorized Jason Choe to file a lawsuit, you're now saying you didn't know he filed a lawsuit in your behalf?

A. Maybe during that time, I might have spoke with him. I did. But

years have passed since then. I really did not know he filed a lawsuit.

Q. And so you met with Jason Choe in 2014. And then you left him and went to Mr. Min in 2016. And then you stayed with Mr. Min through 2016 for a year. And then you went back to Choe in '17. And then he files a lawsuit two days before your November birthday in 2017?

A. Yes, but we had no communication after that—

Q. And now you're testifying in 2019. And your testimony is: ["]So do you know if a lawsuit was ever filed? I have no idea."

A. Yes, I did. You look for other lawyers, after criminal trial is over. If I had an idea that the lawsuit was filed, why would you look for another lawyer? I did not know that Jason was my lawyer, I really did not.

Q. By looking for another lawyer, are you referring to [the prosecutor's] husband?

A. Yes. It was a question that was brought up.

Q. And so when you're talking about looking for another lawyer, can you explain to the judge what you meant by that?

A. We were looking for a civil lawyer, yes.

Q. And you went to—or your aunt went to [the prosecutor] to see if she would—her husband would represent you?

A. Yes. My aunt did ask [the prosecutor] because during our meeting, she brought up that her husband was a civil lawyer.

Q. And so you had—and this is after the verdict?

A. Yes.

Q. And after the verdict, you wanted to sue your stepfather, correct—

A. Yes.

The complainant insisted she did not have any interest in money from appellant, but she admitted "[i]t was an option that was given to us" and "we took it." She testified:

–22–

Q. [DEFENSE COUNSEL:] In Exhibit O where you say, you do not have any interests in money from your stepdad, that doesn't refer to your stepmother, does it—I mean, to your mother, does it?

A. No, it does not.

Q. You say, "no." Is that true?

A. Honestly, I do not have any interest in money from him. It was an option that was given to us, so we took it.

Q. Okay. So your testimony now is that "Do you have any interests in money from your stepdad? No." That's a true statement?

A. Honestly, I could care less. All I wanted was for him to go to jail. That is why I spoke with Jason [Choe].

Q. Are you interested in pursuing a lawsuit with him now?

A. Yes, I am.

Q. Okay. So it was just this moment in time, in Exhibit—during your trial testimony, at the moment you're in front of the jury and you're being asked about your motives to testify falsely about your stepfather—

A. It was not false.

Q. —it was at that one moment, is when you did not want to have—you did not have any interest in money—

A. I didn't have interest—

Q. —is that your testimony?

A. —in his money.

The complainant testified that at the age of sixteen she did not understand much about the legal system and did not know the difference between criminal and civil law. She testified: "[T]hey told us we could file to sue them" but "never said 'civil,' so we took that option to sue [appellant]." She explained that she sought out

–23–

the advice of attorneys because appellant had "touched me every single night," an accusation she insisted was still true. She testified that if she had wanted money from appellant she would have dropped the charges against him because her mother had offered her money and a car, among other things, to drop the charges, but she would not accept such things. Her aunt Choon, who had been very protective of her, believed appellant should go to prison and should have to pay for college for the complainant because of everything he had put her through.

After hearing all of the evidence presented, the trial court took the matter under advisement. The court subsequently denied the motion for new trial in an order signed on April 23, 2019, based on a review of appellant's motion, the supporting brief, and the exhibits and evidence admitted at the hearing. The trial court made no findings of fact or conclusions of law.

## DISCUSSION

In his point of error, appellant argues the trial court abused its discretion by not granting a new trial because appellant was denied due process and due course of law when the State relied on the complainant's false testimony at trial. Appellant claims the complainant had a financial motive to testify falsely because she filed a lawsuit against him in 2017 seeking over a million dollars in damages, and she left the jury with a false impression that she did not want appellant's money because she was only seeking justice. Appellant also argues that this false testimony was material because the trial centered on the complainant's uncorroborated testimony

that an offense occurred.

It is well established that granting or denying a motion for new trial lies within the trial court's discretion. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). Therefore, the standard of review for a trial court's ruling on a motion for new trial is abuse of discretion. *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993). We will reverse a trial court's ruling only when the decision to grant or deny the new trial was so clearly wrong that it was outside the zone within which reasonable persons might agree. *Id.* at 695 n. 4. In the absence of contrary evidence, it is presumed the trial court properly exercised its discretion. *Beard v. State*, 385 S.W.2d 855, 856 (Tex. Crim. App. 1965).

"'The Due Process Cause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly.'" *Ex parte Chavez*, 371 S.W.3d 200, 207–08 (Tex. Crim. App. 2012) (quoting *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011)). The due-process inquiry is twofold: (1) was the testimony false and, if so, (2) was it material. *Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014); *Chavez*, 371 S.W.3d at 207–10. A defendant must prove these two prongs by a preponderance of the evidence. *Weinstein*, 421 S.W.3d at 664–65.

Testimony need not be perjured to constitute a due-process violation; it is sufficient if the testimony was "false." *Weinstein*, 421 S.W.3d at 665; *Chavez*, 371 S.W.3d at 208. The question we must ask in a false testimony claim is whether,

taken as a whole, the testimony "gives the jury a false impression." *Chavez*, 371 S.W.3d at 208; *see also Weinstein*, 421 S.W.3d at 666. Mere inconsistencies or conflicts in evidence do not establish falsity, and moderate differences between the evidence suggesting falsity and the complained-of testimony are likewise insufficient to establish falsity. *Ex parte De La Cruz*, 466 S.W.3d 855, 870–71 (Tex. Crim. App. 2015). Also, the good or bad faith of a witness or the State is irrelevant to a false-testimony due-process analysis. *Weinstein*, 421 S.W.3d at 666.

If the testimony is determined to be false, we then determine whether it was "material." *Weinstein*, 421 S.W.3d at 665. False testimony is material if there is a "reasonable likelihood" it affected the judgment of the jury. *Id*. (citing *Chavez*, 371 S.W.3d at 206–07). "This standard is more stringent (i.e., more likely to result in a finding of error) than the standard applied to *Brady* claims of suppressed evidence, which requires the defendant to show a 'reasonable probability' that the suppression of evidence affected the outcome." *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011). The "reasonable likelihood" standard is the equivalent of the standard for constitutional error, which requires the beneficiary of constitutional error to prove beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *Id*. We consider the entire record in assessing the materiality of false testimony. *Chavez*, 371 S.W.3d at 209–10.

Citing the testimony of the two attorneys and the complainant herself at the motion for new trial hearing, appellant argues that the complainant's testimony at

trial that she did not have a financial motive for her testimony was false, as was her testimony that she did not authorize the civil lawsuit or that she only consulted with Choe in 2014. Appellant also argues that because defense counsel never had a "Perry Mason moment" to show the complainant's testimony was false, the jury did not have an opportunity to truly weigh her alleged financial motive. Additionally, appellant argues that "[h]ad the jury heard that the Complainant was not only interested in obtaining justice but was interested in receiving over one million dollars from the Appellant, there is reasonable probability that the verdict in this indictment would have been not guilty."

For support appellant cites *Ramirez v. State*, 96 S.W.3d 386 (Tex. App.—Austin 2002, pet. ref'd), which involved the deception of the court and jurors through the presentation of known false and misleading evidence. In *Ramirez*, the State elicited testimony from the complaining witness that after the defendant, a uniformed police officer, had forced her to perform oral sex, she called the Austin Police Department, then called 911, and finally called an attorney. *Id*. at 392. The complainant testified that she "was just asking" the attorney what she should do, that she "didn't know who to trust," that she was not "looking for anything out of it," and that she was just trying to get some advice. *Id*. The State asked the complainant if she contacted the attorney to "try to get money or anything like that?" *Id*. at 393. She replied, "No, I'm not worried about money. I just want justice out of the whole case." *Id*. Later, however, it was shown during the hearing on a motion for new trial

that, prior to trial, the attorney had "informed the particular prosecutors in the criminal case that he had filed the civil lawsuit or intended to do so shortly thereafter." *Id*. The State did not dispute this testimony. *Id*. The Austin Court of Appeals noted that despite the previous granting of the appellant's *Brady* motion, the State had purposely elicited the complained-of testimony and allowed it to remain uncorrected. *Id*. The court also observed that when the complainant testified at trial, there was, in fact, a civil suit already on file. *Id*. at 395. The State argued that the complainant had no knowledge the civil lawsuit had been filed and did not know her testimony was false, but as the court of appeals pointed out, "the State knew her testimony was false and misleading and used it." *Id*.

The situation in the present case is different. To begin with, no one is alleging the State knew the complained-of testimony was false. Moreover, based on our review of the record, the trial court could have concluded that although the complainant was sometimes inaccurate in her trial testimony regarding matters such as dates or the number of conversations she had with attorneys, her trial testimony about her lack of knowledge about the actual filing of a civil suit and the absence of a financial motive was not false. *See, e.g., De La Cruz*, 466 S.W.3d at 870–71 (mere inconsistencies or conflicts in evidence do not establish falsity, nor do moderate differences between evidence suggesting falsity and the complained-of testimony). As the complainant asked during her motion for new trial testimony, "If I had an idea that the lawsuit was filed, why would you look for another lawyer?" The

complainant also pointed out she did not have a sophisticated understanding of the American legal system at the age of sixteen and did not know the difference between civil and criminal law. A reasonable interpretation of the record is that the actions of both the complainant and her aunt Choon showed they did not understand that a civil suit had been filed. Indeed, it was only after appellant had been acquitted of sexual assault that the complainant's aunt Choon talked to the prosecutor and sought to hire the prosecutor's husband, a civil attorney, to pursue a civil claim against appellant—perhaps believing the complainant could get justice through a civil suit for money for the abuse appellant had inflicted on the complainant.

In addition, the complainant stood by her trial testimony that she never wanted to file a lawsuit against *them*, referring to both appellant and her mother. Appellant ridicules the complainant's "parsing" of the word "them," arguing it is irrelevant to the false impression left with the jury that she did not want to sue or did not want money from appellant. Yet, the complainant stood by her trial testimony, and she explained the apparent discrepancy. As she testified at the motion for new trial hearing, the complainant had a complicated relationship with her mother, and she feared her mother might go to prison if she was named in the civil suit. This was why, according to the complainant, "I did not want to go forward with suing my mom," but "I do want to sue [appellant]." Furthermore, she never wavered from her insistence that appellant sexually abused her. She told the jury that she wanted the case litigated in criminal court because she wanted appellant to feel the

"embarrassment" that she had felt; that she wanted to find "justice against him;" and that he had done "horrible" things to her. And she testified at the motion for new trial hearing that if she had just wanted money from appellant she could have accepted her mother's offer of money and a car, among other things, to drop the charges—an offer the complainant refused. We conclude that no false impression was left with the jury regarding the complainant's lack of a financial motive or interest. Accordingly, appellant has not shown the complainant's testimony at trial was false.

More significantly, the key factor distinguishing this case from *Ramirez* is that in the instant case the complainant's alleged financial motivation or interest in the case was extensively explored at trial. The complainant was, as we have seen, subject to thorough cross-examination by defense counsel regarding, among other things, the civil lawsuit, Jason Choe, and whether he filed suit with the complainant's consent. As the trial judge pointed out at the end of the motion for new trial hearing, the complainant was subject to "very vigorous" cross-examination by defense counsel "to the extent she got extremely emotional and was actually a little bit defiant toward" defense counsel. The defense also called a civil attorney to cast doubt on the idea Choe could have filed the lawsuit without the complainant's knowledge. And defense counsel emphasized this point during closing arguments, ridiculing the notion that Choe would have filed suit without the complainant's consent. He called the accusations against appellant a "con" or a "put-up," an effort

to simply "squeeze money" out of him:

> . . . . This lawsuit is huge. The lawsuit is huge. If you think for a second—if you think for a second that this is just some rogue lawyer, stop and think. They went to the lawyer. They went to the lawyer because [the complainant] told you that was a family friend. This isn't some lawyer that's operating in a strip mall taking advantage of a language barrier to prey on clients to enrich himself. They went to see Jason Choe immediately, even before they called the police, which also doesn't make any sense if you really think about it. They go see the civil lawyer first, and it's Jason Choe.

> So you mean Jason Choe, someone that they knew, someone they went to first, they considered a trustworthy family friend to give them good advice, is then going to put himself in a situation where he could be charged with a felony offense himself or potentially be disbarred for filing a lawsuit asking for over a million dollars, because of allegations of child sexual abuse, where she's listed as the plaintiff against [appellant] and her mother?

> It goes back to what I told you in opening statement, this is a con. This is a put-up. They're trying to squeeze money out of a successful man who is an old school Korean, traditional and rigid. And his stepdaughter, who came into his life, and he came into her life when she's about ten and he's nearly 70, the age of like her grandpa, and you're trying to like blend that, and it didn't blend. It never blended. It got to the point where she wanted out of there. She wanted out of there. She wanted to go back and live with her aunt and uncle who she'd lived with before. There was less restrictions. Things were easier. She wanted out.

Given how thoroughly the complainant's alleged financial motivation or interest was explored at trial, we do not believe it is reasonably probable the outcome of the trial would have been different if evidence had been presented to the jury that the complainant knew before trial that an attorney had already filed a civil suit on her behalf, that she consulted with her attorney on that case more than once, or that she wanted to be financially compensated by appellant because he sexually abused

–31–

her.  *See, e.g., Webb v. State*, 232 S.W.3d 109, 115 (Tex. Crim. App. 2007) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").  Therefore, we conclude appellant has failed to carry his burden on both the materiality and the false testimony prongs of his false-testimony due-process claim.[4]  The trial judge's ruling denying the motion for new trial was, consequently, not an abuse of discretion, and we overrule appellant's issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
190193F.U05

---

[4] Although appellant also references his right to the due course under the Texas Constitution, *see* TEX. CONST. art. I, § 19, our inquiry is confined to the issue that was briefed and argued by the parties.



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

JOSEPH KIM, Appellant

No. 05-19-00193-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-34581-U.
Opinion delivered by Justice Myers.
Justices Schenck and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 13th day of March, 2020.